**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ABERDEEN CLAIMS ADMINISTRATION, INC., Trustee for ABERDEEN CLAIMS TRUST and ABERDEEN CLAIMS TRUST II,** | : : : : : : |
| **Plaintiff,** | : Civil Action No. 2:09-cv-5453-NS : |
| **v.** | : : |
| **SATYAM COMPUTER SERVICES LIMITED, B. RAMALINGA RAJU, B. RAMA RAJU, SRINIVAS VADLAMANI, PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED, PRICE WATERHOUSE, PRICEWATERHOUSECOOPERS PRIVATE LIMITED, LOVELOCK & LEWES, S. GOPALAKRISHNAN, SRINIVAL TALLURI, MAYTAS INFRA LIMITED, MAYTAS PROPERTIES, BYRRAJU TEJA RAJU, and BYRRAJU RAMA RAJU JR.,** | : Jury Trial Demanded : : : : : : : : : : : : : |
| **Defendants.** | : : |

## FIRST AMENDED COMPLAINT

Keith R. Dutill (PA 46387)
William E. Mahoney (PA 67407)
Neal R. Troum (PA 94572)
Heather M. Tashman (PA 91004)
Joseph T. Kelleher (PA 202786)
Stradley, Ronon, Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
(215) 564-8000
(215) 564-8120 (facsimile)

Attorneys for Plaintiff, Aberdeen Claims
Administration, Inc., Trustee for Aberdeen Claims
Trust and Aberdeen Claims Trust II

**Table of Contents**

I.      The Nature of the Action ................................................................................................ 1

II.     Jurisdiction and Venue ................................................................................................... 5

III.    The Parties ...................................................................................................................... 6

    A.      The Plaintiff ........................................................................................................ 6

    B.      The Defendants ................................................................................................. 10

        1.      The Satyam Defendants ........................................................................ 10

        2.      The PwC Defendants ............................................................................ 11

        3.      The Maytas Defendants ......................................................................... 17

IV.     The Fraud ...................................................................................................................... 18

    A.      The $1 Billion Deception .................................................................................. 18

    B.      The PwC Blessing ............................................................................................. 46

    C.      The Theft by the Insiders .................................................................................. 50

V.      The Public Confession and the Indictments .................................................................. 55

VI.     The Sudden Collapse in the Price of Satyam Securities ............................................... 57

VII.    Additional Allegations Relating to Scienter .................................................................. 57

VIII.   Additional Allegations Relating to Loss Causation ....................................................... 59

IX.     Additional Allegations Relating to Reliance ................................................................. 60

The Claims ............................................................................................................................ 61

Plaintiff, Aberdeen Claims Administration, Inc., Trustee for Aberdeen Claims Trust and Aberdeen Claims Trust II, by and through its undersigned counsel, brings this civil action and avers as follows:

## I.      NATURE OF THE ACTION

1.      This is an action to recover losses arising out of a massive fraud at Satyam Computer Services Limited ("Satyam") involving thousands of forged invoices and contracts, dual sets of account books, phony bank statements, and public financial disclosures filed with the United States Securities and Exchange Commission ("SEC") that overstated assets by over $1 billion.

2.      B. Ramalinga Raju ("Ramalinga Raju"), Satyam's Chairman, founder, and one of the chief architects of the fraud, has confessed to the fraud publicly and in writing.  He described the protracted and sweeping plot to conceal the truth over many years as "like riding a tiger, not knowing how to get off without being eaten."  (A copy of the written confession of Satyam's Chairman is attached hereto as Exhibit A and incorporated herein by reference.)

3.      Satyam is an information technology provider which, prior to the disclosure of this fraud, maintained a global client list that included over a third of the companies comprising the Fortune 500, with market capitalization of nearly $2.5 billion.

4.      Satyam's common stock traded in India on the Bombay Stock Exchange ("the Bombay Exchange") and the National Stock Exchange ("the National Exchange"), and its American Depository Receipts ("ADRs") traded on the New York Stock Exchange ("NYSE").

5.      With a United States headquarters in Santa Clara, California, Satyam maintains offices throughout the United States, including in Kennett Square, Pennsylvania.  Most of Satyam's income is derived from sources within the United States.

6.     Defendants herein are:

(a)     Satyam,

(b)     Ramalinga Raju,

(c)     B. Rama Raju ("Rama Raju"),

(d)     Srinivas Vadlamani ("Vadlamani"),

(e)     PricewaterhouseCoopers International Limited ("PwCIL"),

(f)     Price Waterhouse,

(g)     PricewaterhouseCoopers Private Limited ("PwC Pvt. Ltd."),

(h)     Lovelock & Lewes,

(i)     S. Gopalakrishnan ("Gopalakrishnan"),

(j)     Srinival Talluri ("Talluri"),

(k)     Maytas Infra Limited ("Maytas Infra"),

(l)     Maytas Properties ("Maytas Properties"),

(m)     Byrraju Teja Raju ("Teja Raju"), and

(n)     Byrraju Rama Raju Jr. ("Rama Raju Jr.").

7.     Rama Raju and Vadlamani were Satyam's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively.  PwC (defined below) provided Satyam with auditing and consulting services.  Gopalakrishnan was PwC India's chief relationship officer, and Talluri was its engagement leader.  Teja Raju and Rama Raju Jr., Ramalinga Raju's son's, were the Vice Chairmen of Maytas Infra and Maytas Properties, respectively.

8.     As set forth at greater length below, Defendants are responsible for the issuance of materially false and misleading statements concerning Satyam's financial condition and accounting practices over a period of at least eight years, and they engaged in a concerted and long-running fraudulent scheme to pillage Satyam while maintaining the façade that Satyam was a highly successful company in robust financial health.

9.     At core, Defendants' scheme involved creating and reporting hundreds of millions of dollars in non-existent work in which Satyam was reportedly engaged, which had the intended effect of falsely making it appear that Satyam was more successful than it really was. PwC India possessed the documents that showed Satyam's true financial condition, and its active participation in the fraud was thus essential.  Maytas Infra and Maytas Properties were essential partners in the fraudulent scheme and recipients of untold sums of money misappropriated from Satyam; they were also among the tools and instrumentalities employed to perpetuate the fraud.

10.     By implementation of this fraudulent scheme, Satyam's assets were intentionally overstated by more than $1 billion.  This caused investors, in reasonable reliance on Defendants' misrepresentations as to the financial condition of Satyam, to purchase Satyam's common stock and ADRs at artificially inflated prices.

11.     This house of cards fell on January 7, 2009.  On that date, Ramalinga Raju admitted that Satyam had engaged in a massive fraud and that over 90% of Satyam's publicly reported assets were fictitious.

12.     Immediately upon Ramalinga Raju's admission of the fraud that had been committed, Satyam's common stock trading on the Bombay Exchange and National Exchange lost almost 77% of its value.  In the United States, shares of Satyam ADRs fell approximately 87% in market action prior to the opening of trading on the NYSE on January 7, 2009.

13.     The Securities and Exchange Board of India ("SEBI") and the Indian Central Bureau of Investigation ("CBI") launched an investigation into Satyam's finances, as well as the activities of its senior officers and directors.  Five of the individual Defendants herein – Ramalinga Raju, Rama Raju, Vadlamani, Gopalakrishnan, and Talluri – have been arrested and indicted for their roles in this fraud.

14.     The following investors (the "Investors") purchased Satyam common

stock on the Bombay Exchange and/or the National Exchange, and/or ADRs on the NYSE:

(a)     Aberdeen EAFE plus SRI Fund, a series of Aberdeen Delaware
Business Trust,

(b)     Aberdeen EAFE plus Ethical Fund, a series of Aberdeen Delaware
Business Trust,

(c)     City of Albany Employees Pension Trust,

(d)     Franciscan Sisters of Chicago,

(e)     The City of New York Deferred Compensation Plan,

(f)     Thrivent Partner Emerging Markets Portfolio, a series of Thrivent
Series Fund, Inc.,

(g)     Aberdeen Global – Responsible World Equity Fund,

(h)     Aberdeen ICVC – Ethical World Fund,

(i)     Mackenzie Financial Corporation – Mackenzie Universal
Sustainable Opportunities Capital Class,

(j)     Aberdeen Canada – Socially Responsible International Fund,

(k)     Aberdeen Canada – Socially Responsible Global Fund,

(l)     NCB Capital Company,

(m)     Raiffeisen Kapitalanlage – Gesellsc mbh R 77-Fonds Segment B,

(n)     First Trust/Aberdeen Emerging Opportunity Fund,

(o)     Aberdeen Emerging Markets Fund Institutional Fund, a series of
Aberdeen Funds,

(p)     Aberdeen Asia Pacific excluding Japan Fund, a series of Aberdeen
Delaware Business Trust,

(q)     Aberdeen Emerging Markets Equity Fund, a series of Aberdeen
Delaware Business Trust,

(r)     Aberdeen Asia Pacific including Japan Fund, a series of Aberdeen
Delaware Business Trust,

(s)     Halliburton Company Employee Benefit Master Trust, and

(t)   Thrivent Partner Worldwide Allocation Fund, a series of Thrivent
Mutual Funds.

15.   The Investors have suffered injury on account of Defendants' actionable
behavior.  Specifically, the Investors purchased Satyam securities at prices that were artificially
inflated due to Defendants' fraud.  When this fraud was uncovered, the value of their
investments plummeted.  The Investors sold their Satyam securities following the disclosure of
the fraud, after the value of those securities had plummeted, and they suffered injury as a result.

16.   Each Investor has, by means of an Assignment of Claims and Power of
Attorney, assigned, transferred, and set over to Aberdeen Claims Trust or Aberdeen Claims Trust
II, for purposes of collection, all rights, title, and interest of the Investor in the Investor's claims,
demands, and causes of action relating to the common stock and/or ADRs of Satyam; and has
appointed Aberdeen Claims Trust or Aberdeen Claims Trust II as its true and lawful attorney in
fact.

17.   Aberdeen Claims Administration, Inc., as trustee for Aberdeen Claims
Trust I and Aberdeen Claims Trust II, brings this action to recover on account of the injuries
suffered by the Investors.

## II.   JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in
that this action arises under the laws of the United States; pursuant to 28 U.S.C. § 1337, in that
this action arises under an Act of Congress regulating commerce; and pursuant to 15 U.S.C. §
78aa, in that this action alleges violations of Chapter 2B of Title 15 of the United States Code
and rules promulgated thereunder.

19.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367
over Plaintiff's state law claims, which are so related to claims in this action within the Court's

original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20.     Venue is proper in the Eastern District of Pennsylvania pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), in that Satyam maintains offices in this District, Satyam transacted business in this District at all relevant times, and the actionable conduct described herein, including the dissemination of false public statements, occurred in this District.

21.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the facilities of the national securities markets.

22.     Defendants' acts, as described herein, were directed towards this District and the United States.  Defendants participated in a scheme involving the submission of fraudulent reports in the United States, specifically intending to artificially inflate the value of securities traded on United States markets and abroad.

## III.     THE PARTIES

### A.     The Plaintiff

23.     Plaintiff, Aberdeen Claims Administration, Inc., is Trustee for Aberdeen Claims Trust and Aberdeen Claims Trust II, trusts formed and existing under the laws of the Commonwealth of Pennsylvania, with their situs in Philadelphia County, Pennsylvania.

24.     Aberdeen Claims Administration, Inc., is a Delaware corporation with its principal place of business in Philadelphia County, Pennsylvania.

25.     Aberdeen Claims Trust and Aberdeen Claims Trust II are the assignees of the rights of the Investors to pursue the claims at issue in this case, as described at greater length herein.

26.     The Investors purchased Satyam common stock on the Bombay Exchange and/or the National Exchange, and/or ADRs on the NYSE in the United States.

27.     The Investors' purchases and sales of Satyam securities are summarized below:

(a)     Aberdeen EAFE plus SRI Fund, a series of Aberdeen Delaware Business Trust, purchased a total of 21,800 Satyam ADRs on or about January 29 and 30, 2007, April 3, 2007, and July 1, 2008.  It sold most of these ADRs on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(b)     Aberdeen EAFE plus Ethical Fund, a series of Aberdeen Delaware Business Trust, purchased a total of 33,600 Satyam ADRs on or about January 29 and 30, 2007, and April 3, 2007.  It sold most of these ADRs on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(c)     City of Albany Employees Pension Trust purchased 11,900 Satyam ADRs on or about January 31, 2007.  It sold them on or about January 12, 2009, after the public disclosure of the fraud.

(d)     Franciscan Sisters of Chicago purchased a total of 34,600 Satyam ADRs on or about April 3 and 25, 2003, May 19, 2006, January 31, 2007, and December 2, 2008.  It sold most of these ADRs on or about January 12, 2009, after the public disclosure of the fraud.

(e)     The City of New York Deferred Compensation Plan purchased 70,200 Satyam ADRs on or about March 5, 2007.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(f)     Thrivent Partner Emerging Markets Portfolio, a series of Thrivent Series Fund, Inc., purchased 15,500 Satyam ADRs on or about April 30, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(g)     Aberdeen Global – Responsible World Equity Fund purchased 75,400 Satyam ADRs on or about November 5 and 19, 2007, and April 11, October 20, and November 20, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(h)     Aberdeen ICVC – Ethical World Fund purchased 253,800 Satyam ADRs on or about February 1 and 2, March 8, July 11, and

7

October 2, 2007, and June 3 and December 5, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(i)    Mackenzie Financial Corporation – Mackenzie Universal Sustainable Opportunities Capital Class purchased 16,600 Satyam ADRs on or about February 1 and 2, March 8, and October 2, 2007.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(j)    Aberdeen Canada – Socially Responsible International Fund purchased 32,100 Satyam ADRs on or about February 1 and 2, 2007.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(k)    Aberdeen Canada – Socially Responsible Global Fund purchased 43,200 Satyam ADRs on or about February 1 and 2, and March 8, 2007, and January 7 and December 5, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(l)    NCB Capital Company purchased 51,800 Satyam ADRs on or about July 15 and 25, August 25, and October 7, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(m)    Raiffeisen Kapitalanlage – Gesellsc mbh R 77-Fonds Segment B purchased 27,300 Satyam ADRs on or about March 17, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(n)    First Trust/Aberdeen Emerging Opportunity Fund purchased 74,000 shares of Satyam common stock on or about November 24, 2006, and August 10, 2007.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(o)    Aberdeen Emerging Markets Fund Institutional Fund, a series of Aberdeen Funds, purchased 860,000 shares of Satyam common stock on or about May 11 and 25, July 3, August 24, September 11 and 21, November 20, and December 7, 2007, and February 25, September 30, October 3, and November 20, 2008.  It sold them on or about January 7 and 9, 2009, after the public disclosure of the fraud.

(p)    Aberdeen Asia Pacific excluding Japan Fund, a series of Aberdeen Delaware Business Trust, purchased 335,000 shares of Satyam common stock on or about October 4, 2005, November 2, 2005, February 1, 2006, June 9, 2006, July 3, 2006, August 1, 2006,

November 13, 2006, January 22 and 24, 2007, March 6 and 7, 2007, October 3, 2007, November 14, 2007, and January 18, 2008. It sold them on or about January 7, 2009, after the public disclosure of the fraud.

(q)     Aberdeen Emerging Markets Equity Fund, a series of Aberdeen Delaware Business Trust, purchased 4,447,000 shares of Satyam common stock on or about October 4, 2005, December 2, 2005, January 3, 2006, February 1, 2006, June 1, 2006, July 3, 2007, August 1, 2006, October 3, 2006, November 1, 2006, January 3, 2007, April 2 and 10, 2007, February 5 and 6, 2008, April 1 and 3, 2008, September 20, 2008, and October 3 and 15, 2008. It sold them on or about January 7, 2009, after the public disclosure of the fraud.

(r)     Aberdeen Asia Pacific including Japan Fund, a series of Aberdeen Delaware Business Trust, purchased 211,710 shares of Satyam common stock on or about March 6, 2006, June 1, 2006, October 26, 2006, February 1, 2007, October 4, 2007, November 6, 2007, January 2, 8, and 18, 2008, March 3, 2008, and September 25, 2008. It sold them on or about January 7, 2009, after the public disclosure of the fraud.

(s)     Halliburton Company Employee Benefit Master Trust purchased 230,929 shares of Satyam common stock on or about August 9, 10, and 24, 2007, and September 30, 2008. It sold them on or about January 7, 2009, after the public disclosure of the fraud.

(t)     Thrivent Partner Worldwide Allocation Fund, a series of Thrivent Mutual Funds, purchased 54,000 shares of Satyam common stock on or about November 14, 2008, and December 4 and 10, 2008. It sold them on or about January 7, 2009, after the public disclosure of the fraud.

28.     The total of the Investors' losses, for which recovery is sought in this case, exceeds $68 million. These losses were proximately caused by Defendants' misrepresentations, as the Investors purchased Satyam securities at artificially inflated market prices and sold the securities after the price of Satyam securities plunged following disclosure of the fraud.

29.     All Investors who purchased Satyam common stock on Indian exchanges reside in the United States.

30.     Of the twenty Investors, fourteen reside in the United States; of those fourteen, seven reside in this District and the other seven are spread over five states.

31.     All of the Investors employed investment advisors who bought and sold, and/or oversaw the purchase and sale of, Satyam securities on their behalf.

32.     The investment advisor who bought Satyam securities on behalf of fourteen of the twenty Investors is located in the Eastern District of Pennsylvania.

33.     The Investors' investment advisors relied on financial statements and related information contained within Satyam's SEC filings in the United States, discussed herein, in making investment decisions respecting Satyam common stock and/or Satyam ADRs.

**B.     The Defendants**

**1.      The Satyam Defendants**

34.     Satyam is a limited liability company organized under the laws of the Republic of India pursuant to the provisions of the Indian Companies Act.  Its primary business office is located in Hyderabad, India, and it has offices throughout the United States.  Satyam's agent for service in the United States is CT Corporation System, 111 8th Avenue, New York, New York, 10011.

35.     Satyam provides outsourced back office infrastructure services.  Prior to its collapse, it had tens of thousands of employees and operated in sixty-six countries and throughout the United States, including in this District.

36.     Satyam provides services in the form of consulting, information technology, and computer outsourcing for some of the largest banks, manufacturers, healthcare companies, and media companies in the world.

37.     Prior to January 7, 2009, the date on which the fraud at issue was made public, Satyam had over 670 million shares outstanding, including over 130 million underlying shares that supported over 65 million Satyam ADRs traded in the United States on the NYSE.

38.     Ramalinga Raju served as Satyam's chairman until his resignation on January 7, 2009, when he disclosed that he had participated in a fraudulent scheme to inflate Satyam's assets by over $1 billion.

39.     Rama Raju is the younger brother of Ramalinga Raju and the former Managing Director and CEO of Satyam.  Rama Raju also resigned on January 7, 2009.

40.     Vadlamani served as Satyam's CFO until his resignation, again on January 7, 2009.  Vadlamani was responsible for overseeing the finances of Satyam and ensuring that its accounting complied with generally accepted accounting principles ("GAAP").  Vadlamani was a member of the Institute of Chartered Accountants of India.

41.     Ramalinga Raju, Rama Raju, Vadlamani, and Satyam are collectively referred to herein as "the Satyam Defendants."

**2.     The PwC Defendants**

**a.     PwCIL**

42.     PwCIL is a membership-based company with headquarters in the United Kingdom and approximately 800 employees throughout the world, including in the United States.

43.     PwCIL has an office in the United States in New York City.

44.     PwCIL member firms are unified and interconnected through membership in PwCIL.

45.     PwCIL and its member firms market themselves under the name
"PricewaterhouseCoopers."

46.     PwCIL's primary activities include identifying market opportunities
around the world, developing strategies to achieve market opportunities, promoting the
"PricewaterhouseCoopers" brand around the world, and developing and working for the
"consistent application of common risk and quality standards by member firms."

47.     PwCIL's main objectives, according to its Memorandum of Association,
include:

>   (a)     providing guidance in relation to, and assisting in the coordination
>           of, the management and governance of its member firms;
>
>   (b)     developing, and promoting and assisting in the development of,
>           common standards, principles, strategies, policies, objectives,
>           plans, projects, programs, practices, and systems to be applied by
>           its member firms in carrying out their business;
>
>   (c)     promoting, monitoring, and assisting in the uniform application of
>           common standards, principles, strategies, policies, objectives,
>           plans, projects, programs, practices, and systems; and
>
>   (c)     providing, or procuring the provision of, services to member firms,
>           including service methodologies and tools, relationship
>           management processes, know-how, training, quality assurance
>           services, insurance, technology, management information,
>           planning, and budgeting processes.

48.     PwCIL coordinates the foregoing activities.

49.     PwCIL carries out its objectives through a formal governance structure,
which includes:

>   (a)     The Global Board, whose primary role is to ensure accountability,
>           protect the PricewaterhouseCoopers network, and ensure effective
>           governance;
>
>   (b)     The Network Leadership Team, whose primary job is to set
>           strategies and standards that the PricewaterhouseCoopers network
>           firms must follow;

      (c)     The Strategy Council, whose primary role is to set strategies and ensure global alignment of PricewaterhouseCoopers network strategies; and

      (d)     The Network Executive Team, which reports to the Network Leadership Team on service and functional issues relating to the PricewaterhouseCoopers network.

50.     The Global Board, the Network Leadership Team, the Strategy Council, and the Network Executive Team, in executing the foregoing activities and objectives, have a direct involvement in the operation, management, policies, and procedures, among other things, of each PwCIL member firm throughout the world.

51.     PwCIL regularly conducts, and its member firms regularly participate in, practice groups, meetings, and training sessions that PwCIL provides in carrying out the above-referenced activities and objectives.

52.     Membership in PwCIL depends on each member firm's ability to comply with numerous risk and quality standards set forth and created by PwCIL.

53.     Each member firm must, to remain a member of PwCIL, sign an "annual compliance confirmation," which sets forth various risk management standards covering independence, ethics, business conduct, assurance, risk management, member firm governance, data protection, and privacy.

54.     In carrying out its activities and objectives, PwCIL rigorously controls its member firms in connection with firm culture, quality procedures, management of risk, and quality of work, among other things.

55.     PwCIL's "Assurance" practice conducts annual reviews of member firms to ensure compliance with global PricewaterhouseCoopers policies and procedures, including review of the performance of partners on selected engagements.

56.     PwCIL's Assurance practice also ensures that audit examinations are performed in accordance with GAAP, and that "financial statements are prepared in conformity with" GAAP.

57.     PwCIL, through its global Assurance practice, also serves to identify possible causes of existing deficiencies and risk in member firms, and it makes recommendations for improvement of member firms in these areas.

58.     Each PwCIL member firm is subject to the global Assurance practice review at least once every three years, but the review can take place more frequently if warranted.

59.     Accordingly, pursuant to its own protocol, PwCIL conducted at least one, and likely more than one, Assurance practice review of PwC India's audit examinations and GAAP compliance while the protracted fraud described herein was ongoing.

60.     PwCIL member firms are also subject to a global Code of Conduct promulgated by PwCIL.

61.     PwCIL provides a centralized global leadership for its member firms, setting strategies, policies, and standards for all the activities that PwCIL member firms are required to follow.

**b.     PwC India**

62.     PwC Pvt. Ltd. and Lovelock & Lewes are Indian accounting firms which maintain a shared office with the address:  #8-2-293/82/A/1131 A, Road No. 36, Jubilee Hills, Hyderabad 500 082, India.

63.     Lovelock & Lewes is also known as "Price WaterhouseLovelock & Lewes," "Lovelock & LewesPrice Waterhouse," and "Lovelock & Lewes/Price Waterhouse."

64.     In addition to their common office in Hyderabad, PwC Pvt. Ltd. and Lovelock & Lewes maintain offices in the following cities throughout India:  Bangalore, Bhubaneswar, Chennai, Guragon, and Kolkata.  In each of these cities, the respective PwC Pvt. Ltd. and Lovelock & Lewes offices share the exact same address, telephone number, and fax number.

65.     Both PwC Pvt. Ltd. and Lovelock & Lewes hold themselves out to the public as "Price Waterhouse."  Price Waterhouse is the entity that Satyam has publicly identified as its auditor, and the Satyam SEC filings discussed herein were signed by auditors on behalf of "Price Waterhouse."

66.     PwC Pvt. Ltd., Lovelock & Lewes, and Price Waterhouse have overlapping leadership.  For example, Ramesh Rajan, who, upon Satyam's request, submitted Price Waterhouse's resignation as statutory auditors for Satyam, was also a partner in Lovelock & Lewes and the CEO of PwC Pvt. Ltd.

67.     PwC Pvt. Ltd., Lovelock & Lewes, and Price Waterhouse use each other's names interchangeably; hold themselves out to the public as a single, integrated entity; and act as alter egos of each other in connection with providing audit services throughout India, including the audits of Satyam.  PwC Pvt. Ltd., Lovelock & Lewes, and Price Waterhouse are collectively referred to herein as "PwC India."

68.     From at least 2001 through 2008, PwC India conducted audits of Satyam, provided consulting services to Satyam, prepared and certified financial statements which were incorporated into Satyam's filings with the SEC, and issued unqualified opinions with regard to Satyam's financial statements, also incorporated into Satyam's SEC filings, which were signed on behalf of "Price Waterhouse."

69.     Gopalakrishnan was PwC India's chief relationship officer and a partner in both Lovelock & Lewes and Price Waterhouse.  Talluri was PwC's India's engagement leader and a partner in both Lovelock & Lewes and Price Waterhouse.  Both were closely involved in PwC India's relationship with Satyam.  Gopalakrishnan and Talluri were the individuals who signed and certified Satyam's financial statements on behalf of "Price Waterhouse," which were incorporated into Satyam's filings with the SEC, discussed further below.

70.     PwC India is a member of PwCIL and, as such, constitutes PricewaterhouseCoopers' presence in India.

71.     On its global website (http://www.pwc.com/gx), PwCIL boasts:  "No matter where you're located, chances are there's a PwC office near you."  The global site goes on to list the various PwC India offices as "PwC's Office Locations in India."

72.     Through PwC India, PwCIL pursues its global strategies and objectives and promotes the PricewaterhouseCoopers brand in India.  PwCIL controls PwC India through its centralized global leadership structure, described above, and it imposes standards, policies, and practices by which PwC India must abide.  Moreover, as a member of PwCIL, PwC India is subject to PwCIL's Assurance practices.  PwCIL thus scrutinizes and controls PwC India's operations and performance, including its audit practices.

73.     By these means, among others, PwCIL exercises control over PwC India, which acts as PwCIL's agent with authority to act on PwCIL's behalf in India.  PwC India thus provided its audit services to Satyam on the authority of, at the direction of, under the supervision of, and/or for the benefit of PwCIL.

74.     PwCIL reacted swiftly to the revelation of the fraud.  PwCIL's global CEO, Sam DiPiazza, in discussing the embarrassment to PricewaterhouseCoopers caused by the

revelation of the Satyam fraud, publicly acknowledged:  "When you have some participation in the situation, as we did in this case as auditors, it's difficult."  In defending the actions of the individual auditors involved, DiPiazza remarked, "Our partners [i.e., PWC India] were clearly misled."  Additionally, PwCIL has represented Gopalakrishnan and Talluri in criminal proceedings in India related to the fraud.

75.     PwCIL and PwC India do not hold themselves out to the public as, and are not perceived by the public to be, distinct entities.  For example, Indian Finance Minister Pranab Mukherjee has referred to "PwC" when referencing Satyam's auditor in public statements, indicating that, in light of PwC's role in the Satyam fraud, the Indian reserve bank "has not approved appointment of PwC as statutory auditor in the scheduled commercial banks from the financial year 2009-10."

76.     PwCIL and PwC India are collectively referred to herein as "PwC."

**3.     <u>The Maytas Defendants</u>**

77.     "Maytas" is "Satyam" spelled backwards.

78.     Maytas Infra is a publicly held company with offices in Hyderabad, India.

79.     Maytas Infra is controlled by Ramalinga Raju, Teja Raju, Rama Raju Jr., and their family.

80.     Teja Raju is Ramalinga Raju's son and the Vice Chairman of Maytas Infra.

81.     Maytas Infra held a significant ownership stake in Satyam.

82.     Maytas Properties is also controlled by Ramalinga Raju, Teja Raju, Rama Raju Jr., and their family.

83.     Rama Raju Jr. is Ramalinga Raju's son and the Vice Chairman of Maytas Properties.

84.     Maytas Properties has significant real estate holdings in the Hyderabad area.

85.     Rama Raju Jr., Teja Raju, Maytas Infra, and Maytas Properties are referred to herein collectively as "the Maytas Defendants."

## IV.    THE FRAUD

### A.    The $1 Billion Deception

86.     For at least the last five years, the information made available to the public, including the Investors, with regard to Satyam's financial health demonstrated that it was a robust and healthy company.

87.     However, the picture painted in Satyam's regulatory submissions and press releases did not reflect the true financial condition of the company.

88.     Specifically, as noted in the criminal charge sheet against Ramalinga Raju, Rama Raju, Vadlamani, Golapakrishna, and Talluri, following their arrests in India, Defendants substantially and falsely inflated Satyam's revenues from sales for years.  The following is a comparison of Satyam's actual revenues from sales versus the amounts fraudulently misstated by Defendants in public filings in the United States for the five years preceding the disclosure of the fraud:

### Satyam Revenue from Sales[1]

| Period | Reported Revenues | Actual Revenues | Difference |
| --- | --- | --- | --- |
| Quarter Ending 06/30/2004 | Rs. 771.49 crore ($167.75 million USD) | Rs. 620.67 crore ($134.96 million USD) | Rs. 150.82 crore ($32.79 million USD) |
| Quarter Ending 09/30/2004 | Rs. 842.03 crore ($183.41 million USD) | Rs. 815.04 crore ($177.53 million USD) | Rs. 26.99 crore ($5.88 million USD) |
| Quarter Ending 12/31/2004 | Rs. 891.26 crore ($205.98 million USD) | Rs. 821.53 crore ($189.86 million USD) | Rs. 69.73 crore ($16.12 million USD) |
| Quarter Ending 03/31/2005 | Rs. 953.34 crore ($218.56 million USD) | Rs. 789.94 crore ($181.10 million USD) | Rs. 163.40 crore ($37.46 million USD) |
| Quarter Ending 06/30/2005 | Rs. 1,034.43 crore ($237.75 million USD) | Rs. 904.48 crore ($207.88 million USD) | Rs. 129.95 crore ($29.87 million USD) |
| Quarter Ending 09/30/2005 | Rs. 1,117.27 crore ($254.27 million USD) | Rs. 972.75 crore ($221.38 million USD) | Rs. 144.52 crore ($32.89 million USD) |
| Quarter Ending 12/31/2005 | Rs. 1,222.63 crore ($272.00 million USD) | Rs. 1,042.81 crore ($231.99 million USD) | Rs. 179.82 crore ($40.00 million USD) |
| Quarter Ending 03/31/2006 | Rs. 1,259.98 crore ($283.27 million USD) | Rs. 1,077.63 crore ($242.27 million USD) | Rs. 182.35 crore ($41.00 million USD) |
| Quarter Ending 06/30/2006 | Rs. 1,386.87 crore ($302.35 million USD) | Rs. 1,330.90 crore ($290.15 million USD) | Rs. 55.97 crore ($12.20 million USD) |
| Quarter Ending 09/30/2006 | Rs. 1,537.70 crore ($334.65 million USD) | Rs. 1,389.04 crore ($302.29 million USD) | Rs. 148.66 crore ($32.35 million USD) |

---

[1] The financial data set forth in this section is stated in rupees, together with the approximate U.S. dollar conversion. In accordance with the Indian numbering convention, the rupee figures are stated in terms of "lakhs" and "crore." One lakh equals 100,000, and one crore equals 10,000,000.  Put differently, 100,000 rupees (Rs. 100,000) is notated as "Rs. 1 lakh"; 20 million rupees (Rs. 20,000,000) would be notated "Rs. 2 crore."

| Period | Reported Revenues | Actual Revenues | Difference |
|---|---|---|---|
| Quarter Ending 12/31/2006 | Rs. 1,594.88 crore ($361.57 million USD) | Rs. 1,368.30 crore ($310.20 million USD) | Rs. 226.58 crore ($51.37 million USD) |
| Quarter Ending 03/31/2007 | Rs. 1,779.15 crore ($412.80 million USD) | Rs. 1,450.55 crore ($336.56 million USD) | Rs. 328.60 crore ($76.24 million USD) |
| Quarter Ending 06/30/2007 | Rs. 1,759.08 crore ($433.48 million USD) | Rs. 1,499.22 crore ($369.45 million USD) | Rs. 259.86 crore ($64.04 million USD) |
| Quarter Ending 09/30/2007 | Rs. 1,948.23 crore ($490.12 million USD) | Rs. 1,605.58crore ($403.92 million USD) | Rs. 342.65 crore ($86.20 million USD) |
| Quarter Ending 12/31/2007 | Rs. 2,110.59 crore ($535.55 million USD) | Rs. 1,692.52 crore ($429.47 million USD) | Rs. 418.70 crore ($106.08 million USD) |
| Quarter Ending 03/31/2008 | Rs. 2,319.38 crore ($579.56 million USD) | Rs. 1,798.25 crore ($449.34 million USD) | Rs. 521.13 crore ($130.22 million USD) |
| Quarter Ending 06/30/2008 | Rs. 2,526.90 crore ($588.61 million USD) | Rs. 2,008.96 crore ($467.96 million USD) | Rs. 517.94 crore ($120.65 million USD) |
| Quarter Ending 09/30/2008 | Rs. 2,700.52 crore ($581.38 million USD) | Rs. 2,246.24 crore ($483.58 million USD) | Rs. 454.28 crore ($97.80 million USD) |

89.     Additionally, year after year, Defendants substantially and falsely inflated Satyam's cash and bank balances.  The following is a comparison of Satyam's actual cash and bank balances versus the amounts fraudulently misstated by Defendants in public filings in the United States from 2004 through 2008:

**Satyam Cash and Bank Balances**

| Period | Reported Amounts | Actual Amounts | Difference |
|---|---|---|---|
| Fiscal Year Ending 03/31/2004 | Rs. 1,782.90 crore ($410.81 million USD) | Rs. 72.22 crore ($16.64 million (USD) | Rs. 1,710.68 ($394.17 million USD) |
| Fiscal Year Ending 03/31/2005 | Rs. 2,202.07 crore ($504.83 million USD) | Rs. 87.82 crore ($20.13 million USD) | Rs. 2,114.25 crore ($484.70 million USD) |
| Fiscal Year Ending 03/31/2006 | Rs. 2,928.70 crore ($658.43 million USD) | Rs. 181.24 crore ($40.75 million USD) | Rs. 2,747.46 crore ($617.68 million USD) |
| Fiscal Year Ending 03/31/2007 | Rs. 3,781.00 crore ($877.26 million USD) | Rs. 229.57 crore ($53.27 million USD) | Rs. 3,551.43 crore ($824.00 million USD) |
| Fiscal Year Ending 03/31/2008 | Rs. 4,273.99 crore ($1.07 billion USD) | Rs. 136.75 crore ($34.17 million USD) | Rs. 4,137.23 crore ($1.03 billion USD) |
| Quarter Ending 06/30/2008 | Rs. 4,657.39 crore ($1.08 billion USD) | Rs. 118.79 crore ($27.67 million USD) | Rs. 4,538.61 crore ($1.06 billion USD) |
| Quarter Ending 09/30/2008 | Rs. 5,160.34 crore ($1.11 billion USD) | Rs. 139.78 crore ($30.09 million USD) | Rs. 5,020.55 crore ($1.08 billion USD) |

90.     Defendants also fabricated the amount of interest accrued on deposits. The following is a comparison of Satyam's actual accrued interest on deposits versus the amounts of accrued interest publicly reported in the United States from 2004 through 2008:

**Satyam Accrued Interest**

| Period | Reported Amounts | Actual Amounts | Difference |
|---|---|---|---|
| Fiscal Year Ending 03/31/2004 | Rs. 93.07 crore ($21.44 million USD) | Rs. 1.81 crore ($417,000 USD) | Rs. 91.26 crore ($21.03 million USD) |
| Fiscal Year Ending 03/31/2005 | Rs. 100.05 crore ($22.94 million USD) | Rs. 0.51 crore ($117,000 USD) | Rs. 99.54 crore ($22.82 million USD) |

| Period | Reported Amounts | Actual Amounts | Difference |
|---|---|---|---|
| Fiscal Year Ending 03/31/2006 | Rs. 115.77 crore ($26.03 million USD) | Rs. 4.71 crore ($1.06 million USD) | Rs. 111.06 crore ($24.97 million USD) |
| Fiscal Year Ending 03/31/2007 | Rs. 165.77 crore ($38.46 million USD) | Rs. 2.04 crore ($474,000 USD) | Rs. 163.73 crore ($37.99 million USD) |
| Fiscal Year Ending 03/31/2008 | Rs. 270.01 crore ($67.47 million USD) | Rs. 1.00 crore ($250,000 USD) | Rs. 269.01 crore ($67.22 million USD) |

### 1.   April 30, 2004, Form 6-K

91.    On or about April 30, 2004, Satyam filed with the SEC in the United States a Report of Foreign Private Issuer (Form 6-K) for the quarter ending March 31, 2004, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.  The April 30, 2004, Form 6-K also includes a Report of Independent Auditors, signed by Price Waterhouse, which states that the financial statements contained in the report "present fairly, in all material respects, the financial position of [Satyam]."

92.    The financial statements contained in the April 30, 2004, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 1,782.90 crore (roughly $410.81 million USD) as of March 31, 2004, and interest on deposits of Rs. 93.07 crore (roughly $21.44 million USD) for the fiscal year ending March 31, 2004.

93.    The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of March 31, 2004, was Rs. 72.22 crore (roughly $16.64 million USD), and the actual interest on deposits for the

0fiscal year ending March 31, 2004, was Rs. 1.811 crore (roughly $417,000 USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

94.     In other words, in Satyam's April 30, 2004, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $394.17 million USD and overstated Satyam's annual interest on deposits by roughly $21.03 million USD.

### 2.     June 29, 2004, Form 20-F

95.     On or about June 29, 2004, Satyam filed with the SEC in the United States an Annual Report of Foreign Private Issuer (Form 20-F) for the fiscal year ending March 31, 2004, which contains Satyam's Consolidated Financial Statements, audited by PwC. The June 29, 2004, Form 20-F also includes a Report of Independent Auditors, signed by Price Waterhouse, which states that the financial statements contained in the report "present fairly, in all material respects, the financial position of [Satyam]," and certifications by Rama Raju, as Satyam's CEO, and Vadlamani, as Satyam's CFO.

96.     The financial statements contained in the June 29, 2004, Form 20-F report an inflated figure, $418.86 million USD, for Satyam's total cash balance on current accounts and deposit accounts as of March 31, 2004, similar to that which previously had been reported in the April 30, 2004 Form 6-K.[2]

97.     The foregoing representation, when made, was false and misleading in that, as noted above, the actual total cash balance on current accounts and deposit accounts as of

---

[2]  The variance between the figures reported in the April 30, 2004, Form 6-K and the June 29, 2004, Form 20-F is likely attributable to differences between the Indian GAAP and U.S. GAAP standards and/or the rupee-dollar exchange rate used to calculate the figures. Regardless, what is clear is that Defendants overstated Satyam's cash and bank balances by hundreds of millions of dollars. Similar minor discrepancies between the figures referenced in the criminal charge sheet (apparently stated in Indian GAAP terms) and figures reported in Satyam's regulatory filings appear throughout this section.

March 31, 2004, was Rs. 72.22 crore (roughly $16.64 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

98.     Thus, in Satyam's June 29, 2004, Form 20-F, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $402.22 million USD.

### 3.     July 29, 2004, Form 6-K

99.     On or about July 29, 2004, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending June 30, 2004, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

100.     The financial statements contained in the July 29, 2004, Form 6-K report revenues of Rs. 77,149.83 lakhs (roughly $167.75 million USD) for the quarter ending June 30, 2004.

101.     The July 29, 2004, Form 6-K also includes a press release, dated July 22, 2004, which states, "Revenue from software services at Rs. 771.50 crore was up 7.05% sequentially and 37.85% compared to the same quarter last year.  The revenue was significantly higher than the guidance of Rs. 728 crore to 732 crore," and an "Investor Link" news update, dated July 22, 2004, and signed by Ramalinga Raju, which states, "I am pleased to report that the Company witnessed a 7.05% sequential revenue growth in Q1 on the back of traction with existing customers and a favorable exchange rate scenario.  Revenue for Q1 at Rs. 771.50 crore was better than the guidance of Rs. 732 crore."

102.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending June 30, 2004, were Rs. 620.67 crore (roughly $134.96 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

103.    In other words, in Satyam's July 29, 2004, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $32.79 million USD, and, consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**4.    October 25, 2004, Form 6-K**

104.    On or about October 25, 2004, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending September 30, 2004, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

105.    The financial statements contained in the October 25, 2004, Form 6-K report revenues of Rs. 84,203.06 lakhs (roughly $183.41 million USD) for the quarter ending September 30, 2004.

106.    The October 25, 2004, Form 6-K also includes a press release, dated October 20, 2004, which states, "Revenue from software services at Rs. 848.10 crore was up 9.93% sequentially and 41.71% compared to the same quarter last year.  The revenue was significantly higher than the guidance of Rs. 810 crore," and an "Investor Link" news update, dated October 20, 2004, and signed by Ramalinga Raju, which states, "I am pleased to report that the Company achieved a 9.93% sequential revenue growth in Q2 on the back of continued

business momentum with existing customers.  Revenue for Q2, at Rs. 848.10 crore, was better than the guidance of Rs. 810 crore."

107.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending September 30, 2004, were Rs. 815.04 crore (roughly $177.53 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

108.    In other words, in Satyam's October 25, 2004, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $5.88 million USD, and, consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**5.      January 27, 2005, Form 6-K**

109.    On or about January 27, 2005, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending December 31, 2004, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

110.    The financial statements contained in the January 27, 2005, Form 6-K report revenues of Rs. 89,126.07 lakhs (roughly $205.98 million USD) for the quarter ending December 31, 2004.

111.    The January 27, 2005, Form 6-K also includes a press release, dated January 20, 2005, which states, "Revenue from software services at Rs. 891.26 crore was up 5.09% sequentially and 34.5% compared to the same quarter last year," and an "Investor Link" news update, dated January 20, 2005, and signed by Ramalinga Raju, which states, "I am pleased to report that the company has achieved 8.86% sequential revenue growth in Q3 in US dollar

26

terms . . . . The growth was driven by a double digit offshore volume increase and stable prices. Revenue for Q3 at Rs. 891.26 crore was better than the guidance of Rs. 886 crore."

112.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending December 31, 2004, were Rs. 821.53 crore (roughly $189.86 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

113.    In other words, in Satyam's January 27, 2005, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $16.12 million USD, and, consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**6.    April 26, 2005, Form 6-K**

114.    On or about April 26, 2005, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending March 31, 2005, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.  The April 26, 2005, Form 6-K also includes a Report of Independent Registered Public Accounting Firm, signed by Price Waterhouse, which states that the financial statements contained in the report "present fairly, in all material respects, the financial position of [Satyam]."

115.    The financial statements contained in the April 26, 2005, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 2,202.07 crore (roughly $504.83 million USD) as of March 31, 2005, and interest on deposits of Rs. 100.05 crore (roughly $22.94 million USD) for the fiscal year ending March 31, 2005.

116.    The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of March 31, 2005, was Rs. 87.82 crore (roughly $20.13 million USD), and the actual interest on deposits for the fiscal year ending March 31, 2005, was Rs. 0.51 crore (roughly $117,000 USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

117.    In other words, in Satyam's April 26, 2005, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $484.70 million USD and overstated Satyam's annual interest on deposits by roughly $22.82 million USD.

118.    The April 26, 2005, Form 6-K also includes a summary of the audited financial results for the quarter ending March 31, 2005, which reports, among other things, quarterly revenues of Rs. 95,336.40 lakhs (roughly $218.56 million USD).

119.    The foregoing representation, when made, was false and misleading in that the actual revenues for the quarter ending March 31, 2005, were Rs. 789.94 crore (roughly $181.10 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

120.    Thus, in Satyam's April 26, 2005, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $37.46 million USD.

**7.    April 28, 2005, Form 20-F**

121.    On or about April 28, 2005, Satyam filed with the SEC in the United States a Form 20-F for the fiscal year ending March 31, 2005.  The April 28, 2005, Form 20-F incorporates by reference the falsified financial statements attached to the April 26, 2005, Form 6-K, discussed above, and reports an inflated figure, $541.44 million USD, for Satyam's total

cash balance on current accounts and deposit accounts as of March 31, 2005, similar to that

which previously had been reported in the April 26, 2005, Form 6-K.

122.    The foregoing representation, when made, was false and misleading in

that, as noted above, the actual total cash balance on current accounts and deposit accounts as of

March 31, 2005, was Rs. 87.82 crore (roughly $20.13 million USD), as determined by SEBI

and/or CBI in their investigation of the Satyam fraud.

123.    Thus, in Satyam's April 28, 2005, Form 20-F, Defendants overstated

Satyam's total cash balance on current accounts and deposit accounts by roughly $521.31 million

USD.

### 8.    July 27, 2005, Form 6-K

124.    On or about July 27, 2005, Satyam filed with the SEC in the United States

a Form 6-K for the quarter ending June 30, 2005, which contains Satyam's Unconsolidated

Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga

Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by

Gopalakrishnan on behalf of Price Waterhouse.

125.    The financial statements contained in the July 27, 2005, Form 6-K report

revenues of Rs. 103,443.2 lakhs (roughly $237.75 million USD) for the quarter ending June 30,

2005.

126.    The July 27, 2005, Form 6-K also includes a press release, dated July 21,

2005, which states, "Revenue from software services stood at US$ 246.04 mn, up 9.4%

sequentially and 40.6% compared to the same quarter last year," and an "Investor Link" news

update, dated July 21, 2005, and signed by Ramalinga Raju, which states, "I am pleased to report

that the Company has recorded revenue of Rs. 1058.71 crore and an EPS of Rs. 5.95 in Q1, as per Indian GAAP financials.  Revenue grew by 8.97% sequently [sic] and 35.7% YoY."

127.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending June 30, 2005, were Rs. 904.48 crore (roughly $207.88 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

128.    In other words, in Satyam's July 27, 2005, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $29.87 million USD, and, consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**9.      October 27, 2005, Form 6-K**

129.    On or about October 27, 2005, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending September 30, 2005, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

130.    The financial statements contained in the October 27, 2005, Form 6-K report revenues of Rs. 111,727.41 lakhs (roughly $254.27 million USD) for the quarter ending September 30, 2005.

131.    The October 27, 2005, Form 6-K also includes an "Investor Link" news update, dated October 20, 2005, and signed by Ramalinga Raju, which states, "I am pleased to report that Q2 was yet another quarter of high single digit, broad based growth, continuing the consistent performance witnessed over the last several quarters.  The Company reported a

revenue of Rs. 1,154.97 crore, a sequential growth of 9.09% as per Indian GAAP consolidated financials."

132.   The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending September 30, 2005, were Rs. 972.75 crore (roughly $221.38 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

133.   In other words, in Satyam's October 27, 2005, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $32.89 million USD, and, consequently, Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**10.   January 27, 2006, Form 6-K**

134.   On or about January 27, 2006, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending December 31, 2005, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

135.   The financial statements contained in the January 27, 2006, Form 6-K report revenues of Rs. 122,263.17 lakhs (roughly $272.00 million USD) for the quarter ending December 31, 2005.

136.   The January 27, 2006, Form 6-K also includes an "Investor Link" news update, dated January 20, 2006, and signed by Ramalinga Raju, which states, "I am pleased to report that our performance in Q3 exceeded the guidance.  As per Indian GAAP consolidated financials, the Company reported a revenue of Rs. 1,265.3 crore, a sequential growth of 9.6%."

137.   The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending December 31, 2005, were Rs. 1,042.81 crore (roughly $231.99 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

138.   In other words, in Satyam's January 27, 2005, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $40.00 million USD, and, consequently, Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**11.    April 28, 2006, Form 6-K**

139.   On or about April 28, 2006, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending March 31, 2006, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

140.   The financial statements contained in the April 28, 2006, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 2,928.70 crore (roughly $658.43 million USD) as of March 31, 2006, interest on deposits of Rs. 115.77 crore (roughly $26.03 million USD) for the fiscal year ending March 31, 2006.

141.   The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of March 31, 2006, was Rs. 181.24 crore (roughly $40.75 million USD), and the actual interest on deposits for the fiscal year ending March 31, 2006, was Rs. 4.711 crore (roughly $1.06 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

142.   In other words, in Satyam's April 28, 2006, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly

$617.68 million USD, and overstated Satyam's annual interest on deposits by roughly $24.97 million USD.

143.    The April 28, 2006, Form 6-K also includes a summary of the audited financial results for the quarter ending March 31, 2006, which reports, among other things, quarterly revenues of Rs. 1,259.97 crore (roughly $283.27 million USD.)

144.    The foregoing representation, when made, was false and misleading in that the actual revenues for the quarter ending March 31, 2006, were Rs. 1,077.63 crore (roughly $242.27 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

145.    Thus, in Satyam's April 28, 2006, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $41.00 million USD.

**12.    April 28, 2006, Form 20-F**

146.    On or about April 28, 2006, Satyam filed with the SEC in the United States a Form 20-F for the fiscal year ending March 31, 2006, which contains Satyam's Consolidated Financial Statements, audited by PwC.  The April 28, 2006, Form 20-F also includes a Report of Independent Registered Public Accounting Firm, signed by Price Waterhouse, which states that the financial statements contained in the report "present fairly, in all material respects, the financial position of [Satyam]," and certifications by Rama Raju, as Satyam's CEO, and Vadlamani, as Satyam's CFO.

147.    The financial statements contained in the April 28, 2006, Form 20-F report an inflated figure, $696.5 million USD, for Satyam's total cash balance on current accounts and deposit accounts as of March 31, 2006, similar to that which previously had been reported in the April 28, 2006, Form 6-K.

148.    The foregoing representation, when made, was false and misleading in that, as noted above, the actual total cash balance on current accounts and deposit accounts as of March 31, 2006, was Rs. 181.24 crore (roughly $40.75 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

149.    Thus, in Satyam's April 28, 2006, Form 20-F, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $655.75 million USD.

**13.    July 28, 2006, Form 6-K**

150.    On or about July 28, 2006, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending June 30, 2006, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

151.    The financial statements contained in the July 28, 2006, Form 6-K report revenues of Rs. 1,386.86 crore (roughly $302.35 million USD) for the quarter ending June 30, 2006.

152.    The July 28, 2006, Form 6-K also includes an "Investor Link" news update, dated July 21, 2006, and signed by Ramalinga Raju, which states, "In Q1, the company has reported a revenue of Rs. 1443 crore, a sequential growth of 9.84%, as per Indian GAAP consolidated financials," and, "The revenue growth has been fueled by a 7.2% increase in volumes and higher contribution from offshore, both critical initiatives that we focus on."

153.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending June 30, 2006, were Rs. 1,330.90 crore (roughly

34

$290.15 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

154.    In other words, in Satyam's July 28, 2006, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $12.20 million USD, and, consequently, Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**14.    October 27, 2006, Form 6-K**

155.    On or about October 27, 2006, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending September 30, 2006, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

156.    The financial statements contained in the October 27, 2006, Form 6-K report revenues of Rs. 1,537.71 crore (roughly $334.65 million USD) for the quarter ending September 30, 2006.

157.    The October 27, 2006, Form 6-K also includes an "Investor Link" news update, dated October 20, 2006, and signed by Ramalinga Raju, which states, "A noteworthy highlight of a positive performance in Q2 is the 11% sequential growth in revenue which not only betters the guidance substantially but also is the highest growth witnessed by the company in the last five years."

158.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending September 30, 2006, were Rs. 1,389.04 crore (roughly $302.29 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

159.     In other words, in Satyam's October 27, 2006, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $32.36 million USD, and, consequently, Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**15.     January 25, 2007, Form 6-K**

160.     On or about January 25, 2007, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending December 31, 2006, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

161.     The financial statements contained in the January 25, 2007, Form 6-K report revenues of Rs. 1,594.87 crore (roughly $361.57 million USD) for the quarter ending December 31, 2006.

162.     The January 25, 2007, Form 6-K also includes a press release, dated January 19, 2007, which states, "Revenue from software services stood at US$ 375.6 mn., up 6.7% sequentially and 33.3% compared to the same quarter last year," and an "Investor Link" news update, dated January 19, 2007, and signed by Ramalinga Raju, which states, "I am pleased to report that the company has achieved 7.7% sequential revenue growth in Q3 in US$ terms."

163.     The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending December 31, 2006, were Rs. 1,368.30 crore (roughly $310.20 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

164.     In other words, in Satyam's January 25, 2007, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $51.37 million USD, and, consequently,

Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

### 16.    April 27, 2007, Form 6-K

165.    On or about April 27, 2007, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending March 31, 2007, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Gopalakrishnan on behalf of Price Waterhouse.

166.    The financial statements contained in the April 27, 2007, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 3,781.00 crore (roughly $877.26 million USD) as of March 31, 2007, and interest on deposits of Rs. 165.77 crore (roughly $38.46 million USD) for the fiscal year ending March 31, 2007.

167.    The April 27, 2007, Form 6-K also includes a summary of the audited financial results for the quarter ending March 31, 2007, which reports, among other things, quarterly revenues of Rs. 1,779.15 crore (roughly $412.80 million USD) for the quarter ending March 31, 2007.

168.    Additionally, the April 27, 2007, Form 6-K includes a press release, dated April 20, 2007, which states, "Revenue [for the quarter ending March 31, 2007,] was Rs. 1,779 crore; a YoY increase of 35.4% and a sequential increase of 7.1%."

169.    The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of March 31, 2007, was Rs. 229.57 crore (roughly $53.27 million USD), the actual interest on deposits for the fiscal year ending March 31, 2007, was Rs. 2.04 crore (roughly $474,000 USD), and the actual

revenues for the quarter ending March 31, 2007, were Rs. 1,450.55 crore (roughly $336.56 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

170.    In other words, in Satyam's April 27, 2007, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $824.00 million USD, overstated Satyam's annual interest on deposits by roughly $37.99 million, and overstated Satyam's quarterly revenues by roughly $76.24 million USD. Consequently, Satyam's press release about Satyam's quarterly revenue growth was false and misleading.

### 17.    April 30, 2007, Form 20-F

171.    On or about April 30, 2007, Satyam filed with the SEC in the United States a Form 20-F for the fiscal year ending March 31, 2007, which contains Satyam's Consolidated Balance Sheets, audited by PwC.  The April 30, 2007, Form 20-F also includes a Report of Independent Registered Public Accounting Firm, signed by Price Waterhouse, which states that the financial statements contained in the report "present fairly, in all material respects, the financial position of [Satyam]," and certifications by Rama Raju, as Satyam's CEO, and Vadlamani, as Satyam's CFO.

172.    The financial statements contained in the April 30, 2007, Form 20-F report an inflated figure, $919.8 million USD, for Satyam's total cash balance on current accounts and deposit accounts as of March 31, 2007, similar to that which previously had been reported in the April 27, 2007, Form 6-K.

173.    The foregoing representation, when made, was false and misleading in that, as noted above, the actual total cash balance on current accounts and deposit accounts as of

March 31, 2007, was Rs. 229.57 crore (roughly $53.27 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

174.    Thus, in Satyam's April 30, 2007, Form 20-F, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $866.53 million USD.

**18.    July 27, 2007, Form 6-K**

175.    On or about July 27, 2007, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending June 30, 2007, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Talluri on behalf of Price Waterhouse.

176.    The financial statements contained in the July 27, 2007, Form 6-K report revenues of Rs. 1,759.08 crore (roughly $433.48 million USD) for the quarter ending June 30, 2007.

177.    The July 27, 2007, Form 6-K also includes a press release, dated July 20, 2007, which states, "Revenue [for the quarter ending June 30, 2007] was US$ 452.3 mn; up 40.3% YoY and 10% sequentially."

178.    The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending June 30, 2007, were Rs. 1,499.22 crore (roughly $369.45 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

179.    In other words, in Satyam's July 27, 2007, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $64.04 million USD, and, consequently, Satyam's press release about Satyam's quarterly revenue growth was false and misleading.

19.   **October 29, 2007, Form 6-K**

180.   On or about October 29, 2007, Satyam filed with the SEC in the United
States a Form 6-K for the quarter ending September 30, 2007, which contains Satyam's
Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by
Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by
Talluri on behalf of Price Waterhouse.

181.   The financial statements contained in the October 29, 2007, Form 6-K
report revenues of Rs. 1,948.24 crore (roughly $490.12 million USD) for the quarter ending
September 30, 2007.

182.   The October 29, 2007, Form 6-K also includes a press release, dated
October 23, 2007, which states, "Revenue [for the quarter ending September 30, 2007,] was US$
509.6 million – up 44.8% YoY and 12.7% sequentially," and an "Investor Link" news update,
dated October 23, 2007, and signed by Ramalinga Raju, which states, "The second quarter was
exceptionally strong as we reported substantially better than expected revenue, broad based
across key verticals, services and regions.  During Q2, Satyam recorded sequential revenue
growth of 12.7% in US $."

183.   The foregoing representations, when made, were false and misleading in
that the actual revenues for the quarter ending September 30, 2007, were Rs. 1,605.58 crore
(roughly $403.92 million USD), as determined by SEBI and/or CBI in their investigation of the
Satyam fraud.

184.   In other words, in Satyam's October 29, 2007, Form 6-K, Defendants
overstated Satyam's quarterly revenues by roughly $86.20 million USD, and, consequently,

Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**20.**     **January 28, 2008, Form 6-K**

185.     On or about January 28, 2008, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending December 31, 2007, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Talluri on behalf of Price Waterhouse.

186.     The financial statements contained in the January 28, 2008, Form 6-K report revenues of Rs. 2,110.58 crore (roughly $535.55 million USD) for the quarter ending December 31, 2007.

187.     The January 28, 2008, Form 6-K also includes a press release, dated January 21, 2008, which states, "Revenue [for the quarter ending December 31, 2007,] was US$ 562.9 million USD; up 49.9% year-over-year and 10.5%, sequentially," and an "Investor Link" news update, dated January 21, 2008, and signed by Ramalinga Raju, which states, "I am pleased to report that Satyam had a strong third quarter, and reported significantly better-than-expected revenue in key regions, verticals, and services.  From a numbers standpoint, Satyam recorded a sequential revenue growth of 10.5 percent, and 50 percent on a year-over-year basis, in US dollars during Q3 – our third consecutive quarter of double-digit growth."

188.     The foregoing representations, when made, were false and misleading in that the actual revenues for the quarter ending December 31, 2007, were Rs. 1,692.52 crore (roughly $429.47 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

189.    In other words, in Satyam's January 28, 2008, Form 6-K, Defendants overstated Satyam's quarterly revenues by roughly $106.08 million USD, and, consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

**21.    April 28, 2008, Form 6-K**

190.    On or about April 28, 2008, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending March 31, 2008, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Talluri on behalf of Price Waterhouse.

191.    The financial statements contained in the April 28, 2008, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 4,273.99 crore (roughly $1.07 billion USD) as of March 31, 2008, and interest on deposits of Rs. 270.01 crore (roughly $67.47 million USD) for the fiscal year ending March 31, 2008.

192.    The April 28, 2008, Form 6-K also includes a summary of the audited financial results for the quarter ending March 31, 2008, which reports, among other things, quarterly revenues of Rs. 2,319.38 crore (roughly $579.56 million USD) for the quarter ending March 31, 2008.

193.    Additionally, the April 28, 2008, Form 6-K includes a press release, dated April 21, 2008, which states, "Revenue [for the quarter ending March 31, 2008,] was US$ 613 mn; up 49.1% YoY and 9.0% sequentially."

194.    The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of March 31, 2008,

was Rs. 136.75 crore (roughly $34.17 million USD), the actual interest on deposits for the fiscal year ending March 31, 2008, was Rs. 1.00 crore (roughly $250,000 USD), and the actual revenues for the quarter ending March 31, 2008, were Rs. 1,798.25 crore (roughly $449.34 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

195.     In other words, in Satyam's April 28, 2008, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $1.03 billion USD, overstated Satyam's annual interest on deposits by roughly $67.22 million, and overstated Satyam's quarterly revenues by roughly $130.22 million USD.  Consequently, Satyam's press release about Satyam's quarterly revenue growth was false and misleading.

### 22.     July 25, 2008, Form 6-K

196.     On or about July 25, 2008, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending June 30, 2008, which contains Satyam's Unconsolidated Financial Statements, audited by PwC.  These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Talluri on behalf of Price Waterhouse.

197.     The financial statements contained in the July 25, 2008, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 4,657.39 crore (roughly $1.08 billion USD) as of June 30, 2008, and revenues of Rs. 2,526.90 crore (roughly $588.61 million USD) for the quarter ending June 30, 2008.

198.     The July 25, 2008, Form 6-K also includes a press release, dated July 18, 2008, which states, "Revenue [for the quarter ending June 30, 2008,] was US$ 637.3 million; up 40.9% year-over-year and 3.9% sequentially," and an "Investor Link" news update, dated July 18, 2008, and signed by Ramalinga Raju, which states, "Our US GAAP revenue for the quarter

43

was $637 million, a growth of 41 percent year over year, and a sequential growth of 4 percent. Our earnings per ADS was 38 cents."

199.     The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of June 30, 2008, was Rs. 118.79 crore (roughly $27.67 million USD), and the actual revenues for the quarter ending June 30, 2008, were Rs. 2,008.96 crore (roughly $467.97 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

200.     In other words, in Satyam's July 25, 2008, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $1.06 billion USD and overstated Satyam's quarterly revenues by roughly $120.65 million USD. Consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

### 23.     August 8, 2008, Form 20-F

201.     On or about August 8, 2008, Satyam filed with the SEC in the United States a Form 20-F for the fiscal year ending March 31, 2008, which contains Satyam's Consolidated Balance Sheets, audited by PwC.  The August 8, 2008, Form 20-F also includes a Report of Independent Registered Public Accounting Firm, signed by Price Waterhouse, which states that the financial statements contained in the report "present fairly, in all material respects, the financial position of [Satyam]," and certifications by Rama Raju, as Satyam's CEO, and Vadlamani, as Satyam's CFO.

202.     The financial statements contained in the August 8, 2008, Form 20-F report an inflated figure, $1.12 billion USD, for Satyam's total cash balance on current accounts

and deposit accounts as of March 31, 2008, similar to that which previously had been reported in the April 28, 2008, Form 6-K.

203. The foregoing representation, when made, was false and misleading in that, as noted above, the actual total cash balance on current accounts and deposit accounts as of March 31, 2008, was Rs. 136.75 crore (roughly $34.17 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

204. Thus, in Satyam's August 8, 2008, Form 20-F, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $1.09 billion USD.

**24. October 24, 2008, Form 6-K**

205. On or about October 24, 2008, Satyam filed with the SEC in the United States a Form 6-K for the quarter ending September 30, 2008, which contains Satyam's Unconsolidated Financial Statements, audited by PwC. These financial statements are signed by Ramalinga Raju, Rama Raju, and Vadlamani on behalf of Satyam's board of directors, and by Talluri on behalf of Price Waterhouse.

206. The financial statements contained in the October 24, 2008, Form 6-K report a total cash balance on current accounts and deposit accounts of Rs. 5,160.34 crore (roughly $1.11 billion USD) as of September 30, 2008, and revenues of Rs. 2,700.52 crore (roughly $581.38 million USD) for the quarter ending September 30, 2008.

207. The October 24, 2008, Form 6-K also includes a press release, dated October 17, 2008, which states, "Revenue [for the quarter ending September 30, 2008] was US$ 652.2 mn; up 28.0% YoY and 2.3% sequentially," and an "Investor Link" news update, dated October 17, 2008, and signed by Ramalinga Raju, which states, "I am pleased to announce a

better-than-guided performance for the second quarter of fiscal year 2009.  We achieved this in a challenging global macroeconomic environment, and amidst the volatile currency scenario that became a reality in the three months since Satyam last reported earnings.  In Q2, our revenue grew by 7.6% quarter-over-quarter and 38.8% year-over-year, as per Indian GAAP, on the back of a 4% volume growth and rupee depreciation against the US dollar."

208.    The foregoing representations, when made, were false and misleading in that the actual total cash balance on current accounts and deposit accounts as of September 30, 2008, was Rs. 139.78 crore (roughly $30.09 million USD), and the actual revenues for the quarter ending September 30, 2008, were Rs. 2,246.24 crore (roughly $483.58 million USD), as determined by SEBI and/or CBI in their investigation of the Satyam fraud.

209.    In other words, in Satyam's October 24, 2008, Form 6-K, Defendants overstated Satyam's total cash balance on current accounts and deposit accounts by roughly $1.08 billion USD and overstated Satyam's quarterly revenues by roughly $97.80 million USD. Consequently, Satyam's press release and Ramalinga Raju's remarks about Satyam's quarterly revenue growth were false and misleading.

210.    All of the false and misleading statements identified herein were made to deceive the investing public, including the Investors, and were included in Satyam's SEC filings in the United States for the purpose of inducing investors to purchase Satyam securities and maintaining the artificially inflated price for Satyam securities in furtherance of the fraud.

**B.    The PwC Blessing**

211.    PwC's role in this fraud was simple:  It closed its eyes to the actual financial figures in its possession that would have revealed this fraud, it certified the veracity of financial statements that hid the fraud at issue, and it ignored numerous red flags that should

repeatedly have set off warning bells.  PwC pocketed well-above-market auditing fees in exchange.

212.    PwC was the auditor for Satyam for at least the last seven years.  It provided independent auditing and consulting services, including reviewing, examining, and approving Satyam's financial statements and other public documents.

213.    Gopalakrishnan and Talluri played key roles in these audits and signed most of the public filings discussed above.

214.    On January 8, 2009, the day after the fraud was revealed, PwC issued an email stating that "[t]he audits were conducted by Price Waterhouse in accordance with applicable auditing standards and were supported by appropriate audit evidence."

215.    Just six days later, Satyam fired PwC as its auditor.  That same day, PwC informed Satyam's new board of directors that "[PwC's] opinions on [Satyam's] financial statements may be rendered inaccurate and unreliable . . . ."  It wrote:  "We wish to advise that Satyam should promptly notify any person or entity that is known to be relying upon our audit report that our audit opinion should no longer be relied upon."  In other words, PwC announced, that contrary to its public statements the week prior, its audits had been unreliable.

216.    GAAP is recognized and used by the accounting profession to establish acceptable accounting practices.  The SEC has endorsed GAAP in Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which provides that financial statements filed both annually and quarterly with the SEC must comply with GAAP.  If SEC filings do not comply with GAAP, they are presumed to be misleading and inaccurate.

217.    PwC, Gopalakrishnan, and Talluri knowingly or recklessly disregarded fundamental GAAP rules when preparing Satyam's financial statements, by, among other things:

47

(a)     failing to provide information useful to investors, creditors, and other users in making rational investment, credit, and similar decisions;

(b)     failing to provide information about the economic resources of Satyam, claims to its resources, and matters that change such resources;

(c)     failing to provide information about how the management of Satyam had discharged its stewardship responsibility to security-holders for the use of enterprise resources entrusted to it;

(d)     failing to provide information about Satyam's financial performance, as used by investors and creditors in order to evaluate whether they are interested in future investment and credit offerings;

(e)     failing to provide reliable and relevant information that represented what it purported to represent;

(f)     failing to provide complete information as would be necessary to validly represent underlying events and conditions; and

(g)     failing to issue conservative statements that adequately considered and reflected uncertainties and risks.

218.     The acts and omissions of PwC, Gopalakrishnan, and Talluri violated GAAP and SEC regulations and are thus presumed to be misleading and inaccurate.

219.     These violations relate to precisely the type of information that investors, investment advisors, and analysts expect to be disclosed to the public.  As a result, the fraud at issue in this case is attributable to the GAAP violations and other misdeeds of PwC, Golapakrishna, and Talluri, as recounted herein.

220.     For example, on multiple occasions, Gopalakrishnan and Talluri received bank balance confirmations in response to their requests to banks to obtain confirmations of Satyam account balances.  These confirmations demonstrated the immense variance between the falsified financial figures disclosed to the public and the true figures fraudulently concealed by

Defendants.  Gopalakrishnan and Talluri ignored these discrepancies – despite having access to both the true and false confirmations – and time and again they certified the false financial data.

221.    PwC, Gopalakrishnan, and Talluri thus had actual knowledge of the falsity of the information disclosed to the public as to Satyam's financial condition, or they acted with reckless disregard for the truth in ignoring information and documents that they themselves had requested, reviewed, or recklessly declined to review, that would have revealed the falsity of Satyam's public disclosures.

222.    Additional red flags that put PwC, Gopalakrishnan, and Talluri on notice of the fraud include the following:

(a)     in the span of just two years, according to Satyam management, bank deposits had more than doubled, from $403.7 million USD to $826.7 million USD;

(b)     Satyam had reported an astonishing 39% compounded annual growth rate since 2001;

(c)     Ramalinga Raju, Rama Raju, and their family members had created related party investment companies through which they funneled their Satyam shares; and

(d)     the Raju family steadily sold off its Satyam shares over the course of several years, ultimately selling off over 90% of its holdings in the years leading up to the disclosure of the fraud, despite the facts that the stock price continued to rise and Satyam appeared healthy and robust to the investing public.

223.    PwC moreover repeatedly noted scores of control deficiencies as part of its audits of Satyam, including the fact that Satyam's computer system was subject to manipulation.  None of these deficiencies, however, made its way into PwC's audit reports, prompted additional audits, or resulted in any type of public disclosure that could have uncovered the fraud.  Instead, PwC ignored its own warnings and certified Satyam's financials, issuing one unqualified audit opinion after another.

224.    PwC India received exorbitant, above-market fees for performing these fraudulent certifications.  According to the criminal charge sheet, the audit fees paid by Satyam to PwC India were as much as 667% greater than those paid by Satyam's peer companies to their auditors.  Further, as noted in the criminal charge sheet, Gopalakrishnan and Talluri received hundreds of thousands of dollars for additional services provided to Satyam which were not properly reflected in Satyam's accounts.

225.    These disproportionate fees are yet further proof of Gopalakrishnan and Talluri's subjective awareness of and participation in the fraud.

226.    PwC, Gopalakrishnan, and Talluri knowingly, or with reckless disregard of the truth, certified as free of material misrepresentations and in conformance with GAAP the falsified financial statements that they knew would be, and in fact were, incorporated into SEC submissions and disseminated to the public.

### C.    The Theft by the Insiders

227.    The falsified financial statements discussed above were used to perpetrate a fraud of over $1 billion USD, in which over 90% of Satyam's reported assets were purely fictional.

228.    The fraud began with the creation of false invoices for work that Satyam never performed.

229.    The Satyam Defendants were able to utilize a loophole in Satyam's computer system to create these documents despite the fact that no corresponding purchase orders existed.  In roughly the five years preceding the public disclosure of the fraud, over 7,000 phony invoices were generated this way, comprising more than 10% of all Satyam invoices in this period.

230.    Satyam's computer system was then manipulated, and files were deleted, to allow the Satyam Defendants, and those acting pursuant to their orders, to conceal these fake invoices and corresponding false revenues as needed.  False books were maintained as part of this scheme.

231.    Satyam employees directed by the Satyam Defendants to create these false invoices have confessed to their role in the fraud to the Indian authorities.  They reported that, following the public disclosure of the fraud, Vadlamani directed them to destroy the evidence that could bring this information to light.

232.    Satyam employees were compensated for their participation in this scheme with stock options to which they were not entitled.

233.    Having created invoices for work never performed, the Satyam Defendants forged documents purporting to show transfers and deposits of funds that were supposed to represent payment to Satyam for this non-existent work.  Rama Raju and Vadlamani authored forged letters to banks in connection with non-existent accounts as part of the paper trail to cover up the fraud, and they caused the creation of other forged documents for this purpose, including false bank deposit receipts and bank statements, the originals of which were destroyed as part of the fraudulent scheme.

234.    Another aspect of the fraud perpetuated by Defendants was the purchase of land using funds stolen from Satyam.  Roughly 327 different companies connected with Ramalinga Raju, Rama Raju, their relatives, and the Maytas Defendants were used as conduits for stolen Satyam money to purchase land for the benefit of the Raju family.  The land was purchased in ways in which the identity of the true owner of the land was kept secret.  It is believed that roughly 8,000 acres of land was purchased in this manner.  It has been reported that

Indian authorities have asked the Indian state of Andhra Pradesh to seize the land that was acquired using stolen Satyam funds.

235.    Defendants Maytas Infra and Maytas Properties formed a central part of the network of companies that were used to acquire land with stolen Satyam assets.

236.    It has further been reported that the Satyam Defendants diverted a portion of Satyam's foreign earnings to tax havens, and these funds were then transferred to Maytas Infra and other companies owned or controlled by Ramalinga Raju and his sons.

237.    Hundreds of millions of dollars were misappropriated from Satyam in this manner, and Maytas Infra and Maytas Properties, as directed by Teja Raju and Rama Raju Jr., played essential roles in perpetrating and concealing this theft.

238.    Additionally, several of the companies created by the Raju family borrowed vast sums from various financial institutions, totaling roughly $375 million, securing these loans with pledged Satyam securities.  Because Satyam's stock price was artificially inflated due to enormous overstatements of the company's assets and revenues in its financial statements, the Raju companies were able to borrow substantial sums backed by essentially worthless collateral.

239.    A significant portion of these loan proceeds – roughly $305 million – was funneled back into Satyam through loans that were neither disclosed to Satyam's investors nor reported as liabilities on Satyam's books.  Satyam used these funds to meet its operating expenses, which was necessary because Satyam's books reflected huge cash and deposit balances that did not exist or were grossly exaggerated, and the revelation of any operating expense shortfall could have uncovered Defendants' scheme.

240. The Satyam Defendants thus used off-the-books loans, backed by artificially-inflated Satyam securities, to keep Satyam running despite the fact that it was essentially broke. Little of this debt was ever repaid, leaving Satyam burdened with roughly $265 million in unpaid loan obligations that had never been disclosed to Satyam's investors.

241. All these activities had the intended effect of making Satyam appear enormously successful and artificially inflating the value of Satyam securities.

242. Defendants Ramalinga Raju, Rama Raju, their family members, and Maytas Infra took advantage of this and sold enormous quantities of Satyam stock, reaping staggering ill-gotten gains. It has been publicly reported that Ramalinga Raju, Rama Raju, and their family held almost a 20% stake in Satyam when it went public in 1991. In the years leading up to the disclosure of the fraud, they collectively sold over 90% of their stock.

243. Ramalinga Raju, Rama Raju, and Maytas Infra reportedly made over $65 million in profit through their sale of Satyam stock. Ramalinga Raju and Rama Raju alone received more than $24 million from insider sales while the fraud was occurring, and Maytas Infra received $42 million.

244. Further, since July 14, 2008, nine Satyam officials, led by Vadlamani, sold a combined 267,358 shares of Satyam securities in thirty-two transactions with a combined value of Rs. 8.63 crore (roughly $1.8 million USD). Vadlamani himself sold over 92,000 shares, the largest number of shares sold by a top Satyam executive, in two different transactions in September 2008. He realized a gain of Rs. 3.07 crore (roughly $670,000 USD).

245. As they did not want their sales of Satyam stock to raise suspicion, many of these sales were accomplished through intermediaries in order to hide the true ownership of the securities sold. Defendants Ramalinga Raju, Rama Raju, their family members, and Maytas

Infra transferred Satyam shares to family members or others whom they trusted, and those shares were then sold through five entities – Elem Investments Private Limited, High Grace Investments Private Limited, Fincity Investments Private Limited, High Sound Investments Private Limited (n/k/a SNR Investments Private Limited), and VEEYES Investments Private Limited.  These five entities had been created by the Raju family to execute and conceal the stock trades, with members of the Raju family serving as directors or controlling shareholders.  Sale proceeds were similarly routed from these entities through the intermediary recipients and then back to Defendants Ramalinga Raju, Rama Raju, their family members, and Maytas Infra.

246.    Defendants Ramalinga Raju, Rama Raju, their family members, and Maytas Infra used intermediaries to hide their roles in these stock sales in order to keep these stock sales hidden.

247.    Sales of Defendants' own Satyam securities in the period prior to the evisceration of the value of Satyam's securities is further evidence that these Defendants were aware of the fraud, acted with fraudulent intent, and benefited in a concrete and personal way in order to profit at the expense of other Satyam security holders, including the Investors.

248.    These Defendants further benefited from the fraud by receiving artificially high dividends on the Satyam securities they held.  Dividends were issued by the Satyam Defendants despite the fact that Satyam had only a fraction of the value that was disclosed to the public.  This constituted another means by which the Satyam and Maytas Defendants benefited from the fraud and had reason to conceal it.  Members of the Raju family and Maytas Infra made an estimated $24 million in dividends through their Satyam holdings, with $5 million or more going to Ramalinga Raju and Rama Raju.

249.     Yet another manner in which money was siphoned from Satyam in order to purchase land for the Raju family, among other things, was the creation on Satyam's books of over 10,000 non-existent employees, whose salaries were in fact paid to the Satyam and/or Maytas Defendants and their family members, funneled through Maytas Infra or Maytas Properties.  As much as $4 million per month was stolen from Satyam by these means.

## V.     THE PUBLIC CONFESSION AND THE INDICTMENTS

250.     On January 7, 2009, prior to the opening of trading on the NYSE, Ramalinga Raju submitted his resignation letter to Satyam's board.

251.     Therein, he announced that Satyam's financial results had been manipulated over a period of years.

252.     Ramalinga Raju's letter specifically referenced Satyam's financials as of September 30, 2008, which he stated contained "[i]nflated (non-existent) cash and bank balances of [$1.04 billion USD]," non-existent accrued interest, understated liabilities, and overstated debtor positions and revenue.

253.     The letter further indicated that the misrepresentations concerning the financial state of Satyam had not been a recent phenomenon but had been taking place for years: "The gap in the Balance Sheet has arisen purely on account of inflated profits over a period of last several years . . . .  What started as a marginal gap between actual operating profit and the one reflected in the books of accounts continued to grow over the years.  It has attained unmanageable proportions . . . .  The differential in the real profits and the one reflected in the books was further accentuated by the fact that [Satyam] had to carry additional resources and assets to justify higher level of operations – thereby significantly increasing the costs."

254.     On January 9, 2009, it was announced that the SEBI had taken possession of Satyam's books and records and was in the process of conducting a thorough independent audit of Satyam's financial statements.

255.     On January 12, 2009, it was reported that Vadlamani had attempted to commit suicide.  Ramalinga Raju and Rama Raju were arrested that same day.  Two days later, Vadlamani was arrested.  All three have been indicted in India for securities fraud.

256.     Gopalakrishnan and Talluri have also been arrested and indicted for their role in this scheme.

257.     It was disclosed soon after the public revelation of the Satyam fraud that a maze of roughly 300 companies connected with the Raju family had been used to siphon cash from Satyam.

258.     Ramalinga Raju has admitted to intentionally manipulating Satyam's financial state.  Ramalinga Raju further admitted that he did this, in part, in order to avoid takeover bids, since any takeover attempt would have led to a review of Satyam's books and discovery of the fraud.  His January 7, 2009, resignation letter further implicated his brother, Rama Raju, as personally involved in the fraud.

259.     Vadlamani admitted in police custody that he had taken part in the massive fraud that was disclosed on January 7, 2009.  He told Indian investigators that he, along with other managers and Satyam employees in the finance department, created a false paper trail, which included the false sales invoices, false bank account statements, and confirmations, as described above.  To cover up the fraud that had been committed, he bribed employees by improperly offering them stock options.

260.    Vadlamani fraudulently modified the published financial results for the company, and Indian authorities discovered in Vadlamani's possession, following his arrest, a set of dual books, one real and one containing the fraudulently falsified data, that were used to perpetuate and conceal the fraud.

## VI.    THE SUDDEN COLLAPSE IN THE PRICE OF SATYAM SECURITIES

261.    When the Indian markets opened on the morning of the announcement of the fraud, Satyam had had over 670 million shares of outstanding equity securities, and the price of Satyam's common stock stood at Rs. 179.10 (roughly $3.67 USD) per share.

262.    After news of the announcement broke, Satyam shares dropped precipitously to a low of Rs. 30.70 (roughly $0.63 USD).  When the Indian markets closed on January 7, 2009, the price of Satyam's common stood at Rs. 39.95 (roughly $0.82 USD), a single-day drop of more than 77%.

263.    Similarly, the price of Satyam's ADRs trading on the NYSE dropped more than 87% in pre-market trading on January 7, 2009, from $9.35 to $1.14, before the NYSE halted trading in the ADRs.  Trading in Satyam ADRs did not open on the NYSE that morning.

264.    Ramalinga Raju's public revelation of the Satyam fraud resulted in the destruction of over $4 billion in market capitalization.

## VII.    ADDITIONAL ALLEGATIONS RELATING TO SCIENTER

265.    Defendants acted with scienter in that Defendants knew or recklessly disregarded the fact that the public documents and statements issued or disseminated by, or in the name of, Satyam were materially false and misleading; knew or recklessly disregarded the fact that that such statements or documents would be issued or disseminated to the investing public, including the Investors and their investment advisors; and knowingly and substantially

participated or acquiesced in, or willfully turned a blind eye to, the issuance or dissemination of such statements or documents.

266.    The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as it was, without the knowledge, complicity, and participation of each Defendant.

267.    Defendants engaged in this scheme to inflate the price of Satyam ADRs and common stock in order to protect and enhance their executive positions, their substantial compensation, and/or the value of their personal holdings in Satyam securities; they thus benefited in a concrete and personal way from the actionable behavior described herein, in order to personally profit at the expense of other Satyam security holders, including the Investors.

268.    Defendants had the motive and opportunity to commit the fraud at issue, and the evidence that they acted recklessly is circumstantial if not direct under the facts of this case.

269.    Defendants had an affirmative duty to promptly disseminate accurate and truthful information and/or correct any misleading or untrue information regarding Satyam's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings, and business prospects.  They further had a duty to correct previously-issued statements that were inaccurate or untrue.  They failed to conform with this duty, and instead knowingly and intentionally or recklessly were responsible for misleading statements and omissions that artificially inflated the price of Satyam stock, and caused the harm for which redress is sought herein.

270.    The magnitude and extraordinary duration of the fraud further gives rise to a strong inference that the Defendants knew that their statements were materially false and misleading.

## VIII.   ADDITIONAL ALLEGATIONS RELATING TO LOSS CAUSATION

271.    Defendants' unlawful conduct as alleged herein directly caused the losses incurred by the Investors.

272.    The false and misleading statements set forth above were widely disseminated to securities markets, investment analysts, and the investing public, including the Investors and their investment advisors.

273.    Those false and misleading statements, which materially misrepresented Satyam's financial health, among other things, caused and maintained the artificial inflation of the price of Satyam's common stock and ADRs and caused those securities to trade at prices substantially in excess of their true value.

274.    The Investors, through their investment advisors, purchased Satyam securities at these artificially inflated prices.  But for Defendants' fraud, the securities would not have traded at these inflated prices, and the Investors would not have purchased the securities at these prices.

275.    The Investors and their investment advisors were unaware of the fraud described herein, were unaware that the prices of Satyam securities were artificially inflated and did not reflect the securities' true market value, and could not have reasonably discovered Defendants' fraudulent scheme by the exercise of reasonable diligence.

276.    The Investors, through their investment advisors, sold the Satyam securities following the public disclosure of the fraud, after the price of the securities had

dropped precipitously on account of the disclosure of the fraud to reflect the true market value of these securities, and the Investors suffered damages as a result.

## IX.   ADDITIONAL ALLEGATIONS RELATING TO RELIANCE

277.   The Investors, through their investment advisors, purchased Satyam common stock and/or ADRs unaware that Defendants' statements and omissions regarding the financial state of Satyam were false and misleading, causing Satyam securities to be artificially inflated.

278.   The investment advisors, acting for the Investors, made the purchases in actual reliance on Defendants' material misrepresentations as to the financial health of Satyam, and in reliance on the integrity of the market price of these securities.

279.   The markets on which Satyam securities were traded are efficient markets:

(a)   Satyam's ADRs were actively traded on the NYSE, a highly efficient market.

(b)   Satyam's common stock was actively traded on the Bombay Exchange and the National Exchange, both highly efficient markets.  The Bombay Exchange boasts more than 4,700 listed companies and a daily trading volume of roughly $1.3 billion; the National Exchange has over 1,400 listed companies and a daily trading volume of approximately $2.4 billion.

(c)   Satyam met the eligibility requirements to be a registered issuer with the SEC, and, accordingly, filed Form F-3 registration statements, the foreign issuer equivalent of a Form S-3.  As a regulated issuer, Satyam also submitted quarterly (Form 6-K) and annual (Form 20-F) reports to the SEC.

(d)   Satyam regularly communicated with the investing public through national and global news media and through public filings with the SEC, and Satyam was followed by several major financial firms.

(e)   The vast majority of Satyam's common stock was owned by public investors, not insiders, most of whom consisted of sophisticated institutional investors.

(f) The market for Satyam ADRs and common stock reacted promptly to information publicly disseminated by Satyam, as evidenced by the immediate market response to Ramalinga Raju's confession.

280. Materially misleading statements were disseminated by Defendants into these open, impersonal, well-developed securities markets. As a result, the fraud on the market doctrine entitles Plaintiff to the presumption of reliance on Defendants' misrepresentations, as the Investors, through their investment advisors, bought and sold their Satyam securities in reliance on the integrity of the market price.

281. The Investors sold their Satyam securities following the disclosure of the fraud, when the price of these securities had dropped precipitously due to this disclosure, and they suffered harm as a result.

\* \* \*

282. The averments herein are based on personal knowledge as to Plaintiff and the Investors, and, as to all other matters are based on, among other things, SEC filings, the written confession of Ramalinga Raja, the criminal charge sheet against the individual Defendants, and other public documents.

## COUNT I – SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

283. Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

284. This Count is brought against Satyam, Ramalinga Raju, Rama Raju, Vadlamani, Gopalakrishnan, Talluri, PwCIL, Price Waterhouse, PwC Pvt. Ltd., and Lovelock & Lewes ("the Count I Defendants").

285. The Count I Defendants violated § 10(b) of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in that they (a) employed devices, schemes, and artifices to defraud; (b)

made untrue statements of material fact or omitted to state material facts necessary in order to make statements that were made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of Satyam securities.

286.    The Count I Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Satyam's earnings and assets, as specified herein.

287.    Each of the Count I Defendants (a) knew or recklessly disregarded material, adverse, non-public information about Satyam's financial results and then-existing business conditions, which was not disclosed; (b) participated in drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about Satyam; (c) carried out a plan, scheme, and course of conduct which was intended to and did deceive the investing public, including the Investors and/or their investment advisors, as alleged herein, and caused the Investors and/or their investment advisors to purchase Satyam securities at inflated prices that they would not have paid had they known of the improper conduct alleged herein.

288.    In furtherance of this improper scheme, plan, and course of conduct, the Count I Defendants took the actions set forth herein.

289.    The Count I Defendants, with actual knowledge of the misrepresentations and omissions of material facts set forth herein, or with reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements that had been made, in light of the circumstances under which they were made, not misleading. The Count I Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing the truth.

290. The Count I Defendants employed devices, schemes, and artifices to defraud and a course of conduct and scheme as alleged herein to improperly manipulate and profit, and they thereby engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the Investors and/or their investment advisors.

291. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, the market prices of Satyam securities were distorted such that they did not reflect the true financial health of Satyam. Relying directly or indirectly on the false and misleading statements made by the Count I Defendants, or upon the integrity of the market in which the securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Count I Defendants but not disclosed in their public statements, the Investors and/or their investment advisors acquired Satyam securities at distorted prices and were damaged thereby when the value of the shares fell after the truth became known, representing the causal connection between the fraud and the damages sought in this suit.

292. At the time of the Count I Defendants' misrepresentations and omissions, the Investors and/or their investment advisors had no knowledge of their falsity.

293. The Investors suffered damages in that, in reliance on the integrity of the market and/or the fraudulent statements described herein, they and/or their investment advisors purchased artificially inflated securities which significantly dropped in value when the truth was revealed regarding the true financial picture of Satyam. The Investors and/or their investment

advisors would not have purchased Satyam stock at the prices paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Count I Defendants' false and misleading statements.

294.   The Count I Defendants are not protected by any statutory safe harbor for forward-looking statements, because that protection does not extend to the allegedly false statements pleaded herein.  First, the specific statements referenced herein were statements of fact, primarily assertions regarding the earnings, assets, and other financial information of Satyam that were simply fictitious and/or non-existent.  Second, many of the specific statements pleaded herein were not identified as forward-looking statements when made.  Third, to the extent there were any forward-looking statements, the Count I Defendants did not provide meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  The Count I Defendants are liable for those false forward-looking statements because they knew, at the time each such statement was made, authorized, or approved by an executive officer or director of Satyam, that those statements were false.

295.   By virtue of the foregoing, the Count I Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of the Count I Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (c) establishing an equitable trust into which the Count I Defendants' personal gains and assets can be deposited for

the benefit of Plaintiff; and (d) awarding such other and further relief as the Court may deem just and proper.

## COUNT II – SECTION 20(a) OF THE EXCHANGE ACT

296.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

297.     This Count is brought against Ramalinga Raju, Rama Raju, Vadlamani, Maytas Infra, Maytas Properties, Teja Raju, and Rama Raju Jr. ("the Count II Defendants").

298.     Satyam committed primary violations of § 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as set forth herein.

299.     The Count II Defendants acted as controlling persons of Satyam within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein.  By reason of their executive positions at Satyam and/or the Maytas entities; their influence over, practical control over, and/or representation within Satyam and its management and board; their family connections; their practical operational management and control over Satyam; and/or their ownership of large blocks of Satyam securities, the Count II Defendants had the power and authority to cause Satyam to engage in the wrongful conduct complained of herein, and they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making and actions of Satyam, including the content and dissemination of the various statements which were false and misleading.

300.     The Count II Defendants were provided with or had unlimited access to copies of Satyam's reports, press releases, public filings, and other statements that were

misleading prior to and/or shortly after these statements were issued, and they had the ability to prevent the issuance of the statements or cause the statements to be corrected.

301.    The Count II Defendants, by virtue of their positions as controlling persons of Satyam, are liable pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

302.    As a direct and proximate result of the Count II Defendants' wrongful conduct, the Investors suffered damages in connection with their purchases of Satyam securities at inflated prices and the losses suffered when the value of their shares fell after the truth became known, representing the causal connection between the fraud and the damages suffered by the Investors.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of the Count II Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (c) establishing an equitable trust into which the Count II Defendants' personal gains and assets can be deposited for the benefit of Plaintiff; and (d) awarding such other and further relief as the Court may deem just and proper.

## COUNT III – SECTION 20(a) OF THE EXCHANGE ACT

303.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

304.    This Count is brought against PwCIL.

305.    PwC India committed primary violations of § 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as set forth herein.

306.    PwCIL acted as a controlling person of PwC India within the meaning of §

20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein.  By reason of the unified

international structure of and relationship among PwCIL and its member companies, including

PwC India, PwCIL had the power and authority to influence and control, and did influence and

control, directly or indirectly, the decision-making of its members firms, including PwC India.

This actual control is demonstrated by, among other things, centralized global leadership;

common practice groups and meetings; required member compliance with PwCIL regulations,

principles, objectives, practices, and professional standards and policies; a shared code of

conduct; and integrated member performance evaluations.  PwCIL, though this relationship, had

the power to cause or direct the management of PwC India's affairs, including the wrongful

behavior described herein.

307.    PwCIL was provided with or had unlimited access to copies of Satyam

reports, press releases, public filings, and other statements in the possession of, or available to,

PwC India, that were misleading prior to and/or shortly after these statements were issued, and

they had the ability to prevent the issuance of the statements or cause the statements to be

corrected.

308.    PwCIL, by virtue of its position as a controlling person of PwC India, is

liable pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

309.    As a direct and proximate result of PwCIL's wrongful conduct, the

Investors suffered damages in connection with their purchases of Satyam securities at inflated

prices and the losses suffered when the value of their shares fell after the truth became known,

representing the causal connection between the fraud and the damages suffered by the Investors.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of PwCIL's wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (c) establishing an equitable trust into which PwCIL's gains and assets can be deposited for the benefit of Plaintiff; and (d) awarding such other and further relief as the Court may deem just and proper.

### <u>COUNT IV – SECTION 20(a) OF THE EXCHANGE ACT</u>

310.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

311.   This Count is brought against Gopalakrishnan and Talluri.

312.   PwC India committed primary violations of § 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as set forth herein.

313.   Gopalakrishnan and Talluri acted as controlling persons of PwC India within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein.  By reason of their executive positions at PwC India, their influence over and/or representation within PwC India and its management and board, and/or their practical operational management and control over PwC India, they had the power and authority to cause PwC India to engage in the wrongful conduct complained of herein, and they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making and actions of PwC India, including the content and dissemination of the various statements which were false and misleading.

314.    Gopalakrishnan and Talluri were provided with or had unlimited access to copies of PwC India's Satyam documents and other statements that were misleading prior to and/or shortly after these statements were issued, and they had the ability to prevent the issuance of the statements or cause the statements to be corrected.

315.    Gopalakrishnan and Talluri, by virtue of their positions as controlling persons of PwC India, are liable pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

316.    As a direct and proximate result of Gopalakrishnan and Talluri's wrongful conduct, the Investors suffered damages in connection with their purchases of Satyam securities at inflated prices and the losses suffered when the value of their shares fell after the truth became known, representing the causal connection between the fraud and the damages suffered by the Investors.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of Gopalakrishnan and Talluri's wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (c) establishing an equitable trust into which Gopalakrishnan and Talluri's personal gains and assets can be deposited for the benefit of Plaintiff; and (d) awarding such other and further relief as the Court may deem just and proper.

## COUNT V – COMMON LAW FRAUD

317.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

318.    This Count is brought against all Defendants.

319.    As set forth above, Defendants made numerous fraudulent misrepresentations; they directly and indirectly participated in a course of conduct employing devices, schemes, and artifices to defraud the Investors and/or their investment advisors; they made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and they engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of Satyam stock and ADRs, including the Investors and/or their investment advisors.

320.    These statements were made with knowledge of their falsity or reckless disregard for the truth.

321.    Defendants intended and knew, or should have known, that the Investors and/or their investment advisors would rely on their misrepresentations relating to the purchase and sale of Satyam common stock and ADRs.

322.    The Investors and/or their investment advisors justifiably relied on Defendants' misrepresentations and/or omissions.

323.    As a direct and proximate result of reliance on the misrepresentations and/or omissions of Defendants, the Investors have been injured.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding to Plaintiff punitive damages, in an amount to be determined at trial; (c) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (d) establishing an equitable trust into

which Defendants' personal gains and assets can be deposited for the benefit of Plaintiff; and (e) awarding such other and further relief as the Court may deem just and proper.

## COUNT VI – NEGLIGENCE

324.   Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

325.   This Count is brought against all Defendants.

326.   Defendants had a duty to, among other things, discover and promptly disseminate accurate and truthful information with respect to Satyam's financial and operational condition.

327.   Defendants breached this duty.

328.   The Investors and/or their investment advisors justifiably relied on the misrepresentations when they purchased Satyam securities.

329.   As a direct and proximate result thereof, the Investors have suffered damages.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding to Plaintiff punitive damages, in an amount to be determined at trial; (c) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (d) establishing an equitable trust into which Defendants' personal gains and assets can be deposited for the benefit of Plaintiff; and (e) awarding such other and further relief as the Court may deem just and proper.

## COUNT VII – NEGLIGENT MISREPRESENTATION

330.   Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

71

331.   This Count is brought against all Defendants.

332.   As set forth above, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading.

333.   At the time that Defendants made the misrepresentations and omissions recounted herein, Defendants knew or should have known that the misrepresentations were false.

334.   Defendants made the representations intending the public, including the Investors and/or their investment advisors, to rely upon them, and further to induce the public, including the Investors and/or their investment advisors, to purchase Satyam securities.

335.   The Investors and/or their investment advisors reasonably relied on Defendants' misrepresentations and omissions, to their detriment.

336.   As a direct and proximate result thereof, the Investors have suffered damages.

WHEREFORE, Plaintiff prays for relief and judgment (a) awarding to Plaintiff all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon; (b) awarding to Plaintiff punitive damages, in an amount to be determined at trial; (c) awarding Plaintiff its reasonable costs and expenses incurred in this action, including costs, counsel fees, and expert fees; (d) establishing an equitable trust into which Defendants' personal gains and assets can be deposited for the benefit of Plaintiff; and (e) awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Keith R. Dutill /HMT

Keith R. Dutill (PA 46387)
William E. Mahoney (PA 67407)
Neal R. Troum (PA 94572)
Heather M. Tashman (PA 91004)
Joseph T. Kelleher (PA 202786)
STRADLEY, RONON, STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
(215) 564-8000
(215) 564-8120 (facsimile)

DATED:  December 29, 2009

Attorneys for Plaintiff, Aberdeen Claims
Administration, Inc., as Trustee for Aberdeen
Claims Trust and Aberdeen Claims Trust II

73

# EXHIBIT A

To the Board of Directors

Satyam Computer Services Ltd.


From B. Ramalinga Raju

Chairman, Satyam Computer Services Ltd.                     January 7, 2009


Dear Board Members,

It is with deep regret, and tremendous burden that I am carrying on my conscience, that I would like to bring the following facts to your notice:

1.  The Balance Sheet carries as of September 30, 2008

    a.  Inflated (non-existent) cash and bank balances of Rs.5,040 crore (as against Rs. 5361 crore reflected in the books)

    b.  An accrued interest of Rs. 376 crore which is non-existent

    c.  An understated liability of Rs. 1,230 crore on account of funds arranged by me

    d.  An over stated debtors position of Rs. 490 crore (as against Rs. 2651 reflected in the books)


2.  For the September quarter (Q2) we reported a revenue of Rs.2,700 crore and an operating margin of Rs. 649 crore (24% Of revenues) as against the actual revenues of Rs. 2,112 crore and an actual operating margin of Rs. 61 Crore ( 3% of revenues). This



has resulted in artificial cash and bank balances going up by Rs. 588 crore in Q2 alone.

The gap in the Balance Sheet has arisen purely on account of inflated profits over a period of last several years (limited only to Satyam standalone, books of subsidiaries reflecting true performance). What started as a marginal gap between actual operating profit and the one reflected in the books of accounts continued to grow over the years. It has attained unmanageable proportions as the size of company operations grew significantly (annualized revenue run rate of Rs. 11,276 crore in the September quarter, 2008 and official reserves of Rs. 8,392 crore). The differential in the real profits and the one reflected in the books was further accentuated by the fact that the company had to carry additional resources and assets to justify higher level of operations –thereby significantly increasing the costs.

Every attempt made to eliminate the gap failed. As the promoters held a small percentage of equity, the concern was that poor performance would result in a take-over, thereby exposing the gap. It was like riding a tiger, not knowing how to get off without being eaten.

The aborted Maytas acquisition deal was the last attempt to fill the fictitious assets with real ones. Maytas' investors were convinced that this is a good divestment opportunity and a strategic fit. Once Satyam's problem was solved, it was hoped that Maytas' payments can be delayed. But that was not to be. What followed in the last several days is common knowledge.

I would like the Board to know:



1. That neither myself, nor the Managing Director (including our spouses) sold any shares in the last eight years – excepting for a small proportion declared and sold for philanthropic purposes.

2. That in the last two years a net amount of Rs. 1,230 crore was arranged to Satyam (not reflected in the books of Satyam) to keep the operations going by resorting to pledging all the promoter shares and raising funds from known sources by giving all kinds of assurances (Statement enclosed, only to the members of the board). Significant dividend payments, acquisitions, capital expenditure to provide for growth did not help matters. Every attempt was made to keep the wheel moving and to ensure prompt payment of salaries to the associates. The last straw was the selling of most of the pledged share by the lenders on account of margin triggers.

3. That neither me, nor the Managing Director took even one rupee/dollar from the company and have not benefitted in financial terms on account of the inflated results.

4. None of the board members, past or present, had any knowledge of the situation in which the company is placed. Even business leaders and senior executives in the company, such as, Ram Mynampati, Subu D, T.R. Anand, Keshab Panda, Virender Agarwal, A.S. Murthy, Hari T, SV Krishnan, Vijay Prasad, Manish Mehta, Murali V, Sriram Papani, Kiran Kavale, Joe Lagioia, Ravindra Penumetsa, Jayaraman and Prabhakar Gupta are unaware of the real situation as against the books of accounts. None of my or Managing Director's immediate or extended family members has any idea about these issues.

Having put these facts before you, I leave it to the wisdom of the board to take the matters forward. However, I am also taking the liberty to recommend the following steps:

1. A Task Force has been formed in the last few days to address the situation arising out of the failed Maytas acquisition attempt. This consists of some of the most accomplished leaders of Satyam: Subu D, T.R. Anand, Keshab Panda and Virender Agarwal , representing business functions, and A.S. Murthy, Hari T and Murali V representing support functions. I suggest that Ram Mynampati be made the Chairman of this Task Force to immediately address some of the operational matters on hand. Ram can also act as an interim CEO reporting to the board.

2. Merrill Lynch can be entrusted with the task of quickly exploring some Merger opportunities.

3. You may have a 'restatement of accounts' prepared by the auditors in light of the facts that I have placed before you.

I have promoted and have been associated with Satyam for well over twenty years now. I have seen it grow from few people to 53,000 people, with 185 Fortune 500 companies as customers and operations in 66 countries. Satyam has established an excellent leadership and competency base at all levels. I sincerely apologize to all Satyamites and stakeholders, who have made Satyam a special organization, for the current situation. I am confident they will stand by the company in this hour of crisis.

In light of the above, I fervently appeal to the board to hold together to take some important steps. Mr. T.R. Prasad is well placed to mobilize support from the government at this crucial time. With the hope that members of the Task Force and the financial advisor, Merrill Lynch (now Bank of America) will stand by the company at this crucial hour, I am marking copies of this statement to them as well.

Under the circumstances, I am tendering my resignation as the chairman of Satyam and shall continue in this position only till such time the current board is expanded. My continuance is just to ensure enhancement of the board over the next several days or as early as possible.

I am now prepared to subject myself to the laws of the land and face consequences thereof.

(B. Ramalinga Raju)


Copies marked to:

1. Chairman SEBI

2. Stock Exchanges



## CERTIFICATE OF SERVICE

I, Neal R. Troum, hereby certify that on this 29th day of December, 2009, I served the foregoing via hand delivery to the Court.  I also served a copy of the foregoing via first-class mail upon those listed on the attached service list.


*Neal R. Troum*
Neal R. Troum

<u>**Service List**</u>

<u>**Via U.S. Mail**</u>

John E. Iole
JONES DAY
500 grant st., 31st fl
Pittsburgh , PA 15219
412-391-3939
jeiole@jonesday.com

Jayant W. Tambe
Geoffrey S. Stewart
David L. Carden
Laura W. Sawyer
JONES DAY
222 East 41st Street
New York, NY 10017
*Attorneys for Satyam Computer Services Ltd.*

Ramalinga Raju
Central Prison
Chanchalguda, Hyderabad
State of Andhra Pradesh, India

B. Rama Raju
Central Prison
Chanchalguda, Hyderabad
State of Andhra Pradesh, India.

Srinivas Vadlamani
Central Prison
Chanchalguda, Hyderabad
State of Andhra Pradesh, India

Stanley J. Parzen
Michele L. Odorizzi
Nicole J. Highland
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
*Attorneys for PricewaterhouseCoopers International Limited*

Fraser Lee Hunter, Jr.
WILMER, CUTLER, HALE & DORR, LLP
399 Park Avenue
New York, NY 10022

*Attorneys for Price Waterhouse, PricewaterhouseCoopers Private Limited, Lovelock & Lewes*

S. Gopalakrishnan,
Central Prison
Chanchalguda, Hyderabad
State of Andhra Pradesh, India.

Srinival Talluri,
Central Prison
Chanchalguda, Hyderabad
State of Andhra Pradesh, India.

Maytas Infra Limited,
Registered office: 6-3-1186/5/A, III Floor
Amogh Plaza, Begumpet, Hyderabad – 500016
Andhra Pradesh, India

Maytas Properties,
Registered office:  6-3-1186/5/A, III Floor
Amogh Plaza, Begumpet, Hyderabad – 50016
Andhra Pradesh, India

Byrraju Teja Raju,
Residence: Plot No. 1242, Road No. 62
Jubilee Hills, Hyderabad
Andhra Pradesh, India

Byrraju Rama Raju Jr.,
Registered office:  6-3-1186/5/A, III Floor
Amogh Plaza, Begumpet, Hyderabad – 50016
Andhra Pradesh, India

L # 1053754 v.1